WILLIAMSON *vs.* DILLON.—June, 1827.

On the 25th of January 1817, D agreed with W, under seal, to deliver to him or order at Z, 250 barrels of flour, not less than 1-3d of which to pass as fine quality, the remaining 2-3ds of superfine, to be at said place by the 1st of March then next, to be lined and in good shipping order; and to deliver on the 15th of the same month 250 barrels of flour of same quality as the first mentioned quality, and in like order, to W, or order, at the above named place; for which flour, on its delivery as above, W bound himself to pay, &c. In an action of covenant on this contract the breach assigned being that the flour when delivered was sour, common, inferior, and of bad quality, and not in good shipping order, and would not and did not pass inspection as fine or superfine.——*Held,* that the inspection was no part of the contract, as it related to the time and place of delivery, but only the evidence or test by which it was agreed the quality of the flour should be ascertained; that the moment the stipulated time for the delivery of the flour had passed, the contract was either performed or broken, and it was only necessary to carry it to a place for inspection, to furnish evidence of its quality; and that the difference of price at Z, at the time stipulated for its delivery, between the

flour delivered and that contracted for, was the true measure of the plaintiff's damages in this case.

In an action on an agreement to deliver a specific article, at a particular time and place, to be paid for at the time of the delivery, the measure of damages is the same, whether brought for a nondelivery, or a delivery of a different quality from that contracted for. The value of such article at the time and place of delivery, is the true measure; unless where the contract showed it was for a particular purpose, and special damages were laid in the declaration.

In proving the relative prices of different qualities of flour at Z, in 1817, other testimony is admissible than direct positive proof from a witness who knew the value at that place; in the absence of such positive proof the jury may infer such value, from proof of the price of each kind of flour in 1817, at other places in the neighbourhood of Z, and at N O, a port to which flour was commonly sent from Z, for inspection and sale; and this latter species of evidence, which is admissible for the above purpose, is not secondary, though of a less conclusive character than direct proof.

Where it was doubtful, from the want of care in drawing a bill of exceptions, whether the whole testimony of a witness was hearsay, part of it being unquestionably so, the appellate court made a comparison of the several parts of the testimony, and determined the whole to be hearsay, and therefore incompetent.

Information received by one partner, the witness, from his copartner, of the price of merchandize purchased by him at Z, for which the witness knew that his house at B, where he resided, paid at the price mentioned, is but hearsay evidence of the price of such merchandize at Z.

Where a witness in his answer taken under a commission declared, "that he was called on in the spring of the year 1817, to state the difference usually allowed on the sale of flour between superfine, fine, &c. that he then stated the difference was as follows," &c.—*Held*, that this might be true, and yet the witness have no knowledge of the facts; his declaration being, that he made the statement, and not that it was true. Such testimony is not admissible in evidence.

APPEAL from *Baltimore* County Court. Action of covenant, brought by the appellant, (the plaintiff below,) who declared against the appellee, (the defendant,) for a breach of the covenant hereinafter mentioned. The breach assigned was, that the defendant did not deliver 500 barrels of flour to pass 1-3d as fine quality, and the remaining 2-3ds as superfine, lined and in good shipping order; but that on the contrary thereof the said flour when delivered was sour, common, inferior, and of bad quality, and not in good shipping order, and would not and did not, nor did any part thereof pass inspection, as fine or superfine, according to the said covenant; and so, &c. The defendant pleaded *performance*, on which plea, issue was joined.

1. At the trial the plaintiff offered in evidence the contract executed between the plaintiff and defendant, bearing date on the 5th of January 1817, which here follows: *"Zanesville, Ohio.* Memorandum of an agreement made and entered into this twenty-fifth day of January 1817, between *Moses Dillon,* of *Zanesville,* state of *Ohio,* and *David Williamson* of *Baltimore,* state of *Maryland,* whereby the said *Moses Dillon* obligates and binds himself to deliver to the said *Williamson,* or order, at *Zanesville,* two hundred and fifty barrels of flour, not less than one-third of same flour to pass as fine quality, the remaining two-thirds of superfine, to be at said place by the first day of March next, to be lined and in good shipping order; and to deliver, on the 15th of same month, two hundred and fifty barrels of flour of same quality as the first mentioned quality, and in like order, to the said *Williamson,* or order, at the above named place, for which flour, on its delivery as above, the said *David Williamson,* Jr. binds and obligates himself to pay to the said *Moses Dillon,* or order, the sum of seven dollars per barrel, for which flour payment will be made to the said *Dillon* with his bonds passed to *Luke Tiernan* and *Kennedy Owen,* of *Baltimore,* interest being added in said bond to the day of the delivery of said flour at the par of exchange. In testimony whereof we have hereunto set our hands and seals this day and year above written.

*Moses Dillon,*        (Seal.)

*D. Williamson,* Jr.   (Seal.)

Signed, sealed and delivered, in the presence of *Isaac Dillon."*

And also gave in evidence, that the plaintiff was at the time of the making and executing of the said contract, a merchant residing in the city of *Baltimore,* and the defendant was the owner of a mill near *Zanesville,* in the state of *Ohio,* and that *New-Orleans* was the great mart for the flour on the *Mississippi,* and its tributary waters. And the plaintiff further offered in evidence, that the trade in flour in the neighbourhood of *Zanesville* was then in its infancy, and that when flour was intended for *New-Orleans,* it was, according to the course of the flour trade in the *Mississippi,* and its tributary waters, to inspect flour at *New-Orleans,* when there was no public inspec-

tion of flour at the place where it was loaded in the boats in-
tended to convey it down the river, and that on its passage
down the river flour is never taken out of the boat to be in-
spected before it arrives at *New-Orleans,* when destined for
*New-Orleans.* And also offered in evidence the depositions of
sundry witnesses, and other proceedings taken and had under
commissions for that. purpose issued out of the said court to
certain commissioners of *Zanesville,* in *Muskingum* county,
in the state of *Ohio.* and of the city of *New-Orleans,* in the
state of *Louisiana.* That part of the testimony which seems.
necessary to be stated, (it being admitted by the parties that the
said commissions had been regularly executed,) is that of *Isaac
Dillon,* the subscribing witness to the contract, who proved its
execution. Also that of *Maunsel White,* of the city of *New-
Orleans,* in answer to the *third* interrogatory propounded to
him by the plaintiff, who proved "that he was called upon in
the spring of the year 1817 by *Richard Relf,* to state the dif-
ference usually allowed on the sale of flour, between superfine,
fine, common and middling: that he then stated that the diffe-
rence was as follows: that two-thirds superfine and one-third
fine, was the proportion established as merchantable; that when
merchantable flour is worth twelve dollars a barrel, fine is only
worth eleven, and middling and common worth eight. That
when merchantable flour is worth eight dollars a barrel, fine is
only worth seven, and middling and common six, and so in
proportion." Also that of "*William Ross,* of the city of *New-
Orleans,* of full age, being produced, sworn and examined, on
the part of the plaintiff in this cause, deposeth as follows: 1.
To the first interrogatory on the part of the plaintiff he an-
swers, that he knows neither of the parties. 2. To the second
interrogatory on the part of the plaintiff he answers, that in
May 1817 he inspected a boat load of flour, amounting to four
hundred and ninety-nine barrels, said to be from *Putnam,* in
the state of *Ohio,* brought to the city by captain *Tarrier,* and
consigned to *John C. Wederstrandt,* Esq. who being absent,
the flour was delivered to *Richard Relf,* Esq. by whom this
deponent was called to inspect it. 3. To the third interroga-
tory on the part of the plaintiff he answers, that the report of
the inspection was as follows: Eighty-three barrels fine, three

hundred and ninety-nine common, sixteen middling, and one condemned. 4. To the fourth interrogatory on the part of the plaintiff he answers, that the flour, except the condemned barrel, did not appear to have been at all injured in its passage down the river, but its bad quality was owing to its having been badly manufactured. 5. To the fifth interrogatory on the part of the plaintiff he answers, that he was commissioned by *James Villere,* governor of the state of *Louisiana,* on the 1st day of January 1816." The defendant then offered in evidence the depositions taken under one of the said commissions at *Zanesville;* and he also offered in evidence, that in the year 1817 *New-Orleans* was the principal port to which flour, that passed the falls of the *Ohio,* was carried, but that it was sometimes sold at other places, when it was discovered that the *New-Orleans* market was not a favourable one; and that boats employed in the transportation of flour ultimately destined for *New-Orleans,* were in the habit of calling at various places on the *Ohio* and *Mississippi,* such as *Cincinnati, Louisville* and *Natches,* when the owner or agent was on board, for the purpose of trying the market at these several places, and were governed on the further prosecution of their voyage to *New-Orleans* by the state of the market at the said places. And thereupon the court, upon the prayer of the plaintiff, gave the following instructions and directions to the jury: If the jury believe from the evidence that there was no public inspection of flour at *Zanesville,* then the plaintiff had a right to take the flour to any port or place on the *Ohio* or *Mississippi* rivers, where there was a public inspection of that article, provided in so doing he did not take it to an unusual port or place for the inspection of flour, descending from *Zanesville;* and if they believe the flour was inspected at *New-Orleans,* that *New-Orleans* was the great mart for the flour of the country on the *Muskingum,* and that flour, sold at any port or place on the *Muskingum* where there was no public inspection, was not usually inspected at any intermediate port between such place and *New-Orleans,* and that this was generally known to the dealers in flour on said river at the time the contract in this cause was executed, that then the jury might infer that *New-Orleans* was not an unusual place for the inspection of flour descending from *Zanes-*

*ville.* And furthermore, if the jury believe that the flour was not taken to an unusual place for inspection, that the defendant in that event took the risk of inspection; and if it does not at such place pass in quality such as the contract has stipulated, then the plaintiff is entitled to a fair indemnity for the difference in value of the flour as delivered and inspected, and the flour contracted to be delivered. The plaintiff then prayed the opinion and instruction of the court to the jury, that if the jury find from the evidence that *New-Orleans* was a usual and proper place for the inspection of flour delivered at *Zanesville,* at the time of the delivery of the flour in question; and if they also find that the flour, when inspected at *New-Orleans,* was of inferior quality, and of less value, as is stated in the deposition of *William Ross,* the flour inspector at *New-Orleans,* in one of the commissions herein before mentioned, than the flour contracted to be delivered, that then the measure of damages is the difference in value at *New-Orleans,* at the time of the inspection, between the flour contracted to be delivered, and the flour in question as passed by the inspector. Which opinion and instruction the Court, [*Archer,* Ch. J. and *Hanson,* and *Ward,* A. J.] refused to give; but instructed the jury, that according to the fair construction of this contract, the proper measure of damages is the difference in value at *Zanesville* between the flour stipulated to be delivered, and that which was delivered at the time the flour was by the contract to be delivered. The plaintiff excepted.

2. The plaintiff then offered to prove by a competent witness, that at the time of the contract in question, and of the delivery of the flour, and of the inspection at *New-Orleans,* the market price at *New-Orleans* regulated the price of superfine, fine, and common flour, on the *Mississippi* and the *Ohio,* at all the places with which he was acquainted, and also the relative value of such flour; and also that the witness was, at the times above mentioned, well acquainted with the flour trade on the *Mississippi* and the *Ohio,* but had not at those times any acquaintance at *Zanesville,* or with the flour trade on the *Muskingum* above *Marietta;* that the witness has no knowledge of the prices or relative value of flour at *Zanesville* itself, but that

at the times above mentioned he was acquainted with the flour trade at *Marietta,* and up the *Ohio* to *Pittsburg,* and there was not the difference throughout that course of more than six cents or 12½ cents per barrel for flour at any of the above places, if it were of the same quality; that at the times above mentioned, flour at *Marietta,* which would not pass inspection as fine, was of no value for exportation, and was not saleable for that purpose; that *Marietta* and *Zanesville* are both situated on the *Muskingum* river, *Marietta* at its mouth, and *Zanesville* about sixty miles higher up; that the price of merchantable flour, at the times above mentioned, at *Marietta,* was at least six dollars or upwards; and by merchantable flour, the witness means flour two-thirds superfine and one-third fine.    The plaintiff offered in evidence, by another competent witness, that in 1817 he resided in the *western country* at *Steubenville,* and was acquainted with the prices of flour from *Louisville* to *Pittsburg,* and with the relative prices which it bore at different places on the *Ohio,* but not off the *Ohio,* and not at *Zanesville*; but at this time cannot state the prices at any of those places; that the buyers made their purchases, and were regulated in their prices by the prospects at *New-Orleans;* and that it was the usage in the places above mentioned to settle any damages for deficiency in quality, when the flour was to be inspected in *Orleans,* by the *Orleans* prices; that whenever there was no inspection at the place where the flour was put on board the boats, it was usual for the flour to be inspected at *Orleans.* To the admissibility of which evidence the defendant objected. And the court were of opinion that the same was not admissible to prove the relative value of superfine, fine, and common flour at *Zanesville,* and was not evidence which the jury were entitled to consider in ascertaining the damages which the plaintiff had sustained by the breach of the contract in this case; but that in order to furnish a standard of damages in this case, the plaintiff is bound to prove the value at *Zanesville* of the flour which the defendant contracted to deliver, and the relative value of that which was delivered at that place at that time; and thereupon refused to suffer the said evidence, or any part thereof, to be given to the jury for the purpose aforesaid. The plaintiff excepted.

3. The plaintiff then prayed the opinion of the court, that in the absence of all proof as to the relative prices of superfine flour, fine flour, and common flour, at *Zanesville*, or at any other place on the *Muskingum* river, except *Marietta*, the jury may, in estimating the damages of the plaintiff in this cause, take into consideration the relative value of the above mentioned qualities of flour at *Marietta*, it being the nearest point to *Zanesville* mentioned in the testimony. Which opinion the court refused to give. The plaintiff excepted.

4. Upon the above evidence given as stated in the first bill of exceptions, the plaintiff prayed the opinion of the court, that in the absence of all proof as to the relative value of superfine flour, fine flour, and common flour, at *Zanesville*, or at any other place on the *Muskingum* river, except *Marietta*, the jury may, in estimating the damages of the plaintiff in this cause, take into consideration the relative value of the above mentioned qualities of flour at *New-Orleans*, with a proper allowance for the expenses and risk of transportation to *New-Orleans* Which opinion the court refused to give. The plaintiff excepted.

5. The plaintiff further offered in evidence by a witness, that he purchased flour at *Zanesville* in the spring of 1817, and paid for it from six to eight dollars per barrel; and that the witness, at the time above mentioned, was engaged in shipping flour from the waters of the *Mississippi* and *Ohio*, and is acquainted with the flour trade in those waters; and that in the opinion of the witness, no merchant acquainted with the said trade would purchase for exportation at *Zanesville*, flour that would not pass inspection as merchantable flour, provided he knew it would not pass. That the witness paid for the freight of flour from *Zanesville* to *New-Orleans* two dollars per barrel; that the witness was not in the *Western Country* in the spring of the year 1817, and did not make the purchases he has mentioned, in person, but that some of the said purchases were made by the partner of the witness, and that some of them were made by his brother, as agent for the mercantile house of which the witness then was a partner, and that all the information of the witness of the facts of the purchases which he has mention-

ed is derived from his said partner and brother, who are both living; but that the witness knows that his house paid for the flour above mentioned, and for other flour purchased at other places on the *Western* waters, at the prices above mentioned, and which prices were stated. to him by his said partner and brother as being the prices which they had contracted to give for the said flour. The defendant objected to the admissi‑ bility of the said evidence. · And the court were of opinion, that the said evidence was not admissible to prove the re‑ lative value at *Zanesville* of superfine, fine, and common flour, and was not evidence which the jury were entitled to consider in ascertaining the damages which the plaintiff had sustained by the breach of the contract in this case; but that in order to furnish a standard of damages in this case, the plaintiff is bound to prove the value at *Zanesville* of the flour which the defendant contracted to deliver, and the relative va‑ lue of that which was delivered at that place at that time; and thereupon refused to suffer the said evidence, or any part there‑ of, to be given to the jury for the purpose aforesaid. The plaintiff excepted.

6. The plaintiff then offered to read in evidence that part of the deposition of *Maunsel White,* which is contained in his answer to the third interrogatory. To the admissibility of which evidence the defendant objected. And the court were of opinion that the said statement contained in the said answer was inadmissible evidence, and refused to let the same go to the jury. The plaintiff excepted.

7. The plaintiff then, in addition to the evidence above stat‑ ed, offered to prove by a competent witness, that the witness purchased flour on the *Mississippi* in the spring of 1817; that the said flour was sold in *New-Orleans* in the spring of that year; that part of the said flour was part superfine, and part common; that the difference in price between superfine and fine was one dollar per barrel, and the difference between su‑ perfine and common was four dollars per barrel; that witness was not in *New-Orleans* himself at the time when the sales were made; he knows that his house received payment for flour sold in *New-Orleans,* at the relative prices above mentioned,

at the time above stated; that the said sales were made by the partner of the witness, and the accounts were rendered of the sales in the manner and at the prices above stated; that the witness had no personal agency in making either the said sales or purchases, or any of them, having himself been residing all along in *Baltimore,* and that the above statement is made entirely on the information of his partner, and the agents of the house who resided in *New-Orleans,* and transacted the business, his said partner being still living. The said sales were made by agents of the house under the immediate direction of the partner of the witness, as he was informed by his said partner, and the accounts of which witness speaks, were rendered by such agents, and received by the witness from his said partner. To the admissibility of which testimony the defendant objected. And the court were of opinion, that the said testimony was inadmissible, and refused to suffer the same, or any part thereof, to go to the jury. The plaintiff excepted.

8. The plaintiff further offered to prove by a competent witness, that the witness was in *New-Orleans* in May 1817, and had orders to purchase flour; that the price of superfine flour at that time was $13; that he does not know the comparative value of fine and superfine flour. In the market of *Baltimore* the difference between fine and superfine is half a dollar. That fine and common flour is inferior in value generally to superfine, but that the witness made no inquiries at *Orleans* in relation to fine or common, and cannot therefore speak of the relative value of those qualities of flour at *New-Orleans.* The plaintiff further offered to prove by another competent witness, that he resided in *New-Orleans,* and did business there as a commission merchant from 1806 to 1811; that he was, during that time, in the practice of selling a good deal of flour, and was well acquainted with the *New-Orleans* market for flour, and the usage of that market at that time, and with the course of trade. That the flour, of which he speaks, was the flour which came down the *Mississippi;* that during the time above mentioned the difference in value between superfine flour and common flour was as follows: that is to say, that when superfine was eleven and twelve dollars, common flour would be

about nine dollars per barrel, and so in proportion, the diffe-
rence being greater when flour was higher, and less when flour
was lower; that the smallest difference the witness ever knew
between superfine flour and common flour in the *New-Orleans*
market was three dollars, and the difference between fine and
superfine was about one and one half dollars per barrel, when
the price was such as is above mentioned, and that difference
increased and diminished according to the price of flour in the
rates above mentioned; fine flour is inferior in value to super-
fine flour, and common flour inferior in value to fine flour.    It
was generally difficult to sell fine or common flour in the mar-
ket at *Orleans*, but superfine flour had generally a ready sale.
That witness had not been at *New-Orleans* since May 1811,
and has no personal knowledge of the prices of flour, or the
usages of trade since that period of time; that they could al-
ways obtain for flour of the *Baltimore* brand two or three dol-
lars more than for flour brought down the *Mississippi* from the
*Western Country*, and would always sell superfine flour for
something, when fine and common flour could not be disposed
of.    And also offered to prove by another competent witness,
that the said witness resided in *New-Orleans* in 1819, and was
a clerk in a mercantile house at that place; that the price of
merchantable flour was at that time $8 per barrel, and that mer-
chantable flour, so called in the market of *New-Orleans*, were
one third fine and two thirds superfine; that the prices of flour
during the months of November and December 1819, and Ja-
nuary and February 1820, were at $8 per barrel, and that prices
fluctuated during the residue of 1819 from 50 cents to a dollar;
that at the time above mentioned, flour which passed inspection
at *New-Orleans* as common only, was of less value, and was
worth in *New-Orleans* only five and a half dollars per barrel,
when merchantable flour was worth $8 per barrel.    Witness
lived there from 1819 to 1822; that while the witness resided
there flour which passed inspection as common flour was al-
ways inferior in value to merchantable flour as above described,
and that when flour was high the difference was greater, and
when lower the difference was less.    And also offered in evi-
dence by another witness, that the witness resided at *Zanes-
ville* from 1811 to 1817, and left *Zanesville* on the 20th of

April 1817; that when he left *Zanesville* he was between 14 and 15 years of age, and the fall before he left there he was employed by several persons, in conjunction with two others, to make an enumeration of the inhabitants of the town of *Zanesville*. The flour from *Zanesville* was generally sent to the *New-Orleans* market, but was sometimes sold on the way, where a market offered, as at *Cincinnati*, *Louisville*, or other places. There was no public inspection for flour at *Zanesville* before or at the time when the witness left there. That at the time they were making the enumeration as above mentioned, they endeavoured to ascertain the amount of flour dispatched from *Zanesville*, and the witness made inquiries on that subject, but he was unable to ascertain it, and gave it up. That the father of this deponent was a physician, and in the habit of receiving wheat from his patients, which he somestimes sold to millers, sometimes had it ground into flour, and sometimes bartered the wheat or flour for such articles as he wanted; that there was very little money in the country, but flour generally had a ready sale for cash, because it was one of the articles usually sent to market to *New-Orleans;* but has no knowledge of any particular sale of flour having been made at *Zanesville*, and speaks only of what he generally understood to be the course of business in relation to flour, and as to what he has already stated in relation to the general destination of flour to *New-Orleans*. He has no personal knowledge on the subject, and no other knowledge than what he derived from the information of others, and from seeing boats frequently depart from *Zanesville*, which he understood from the boatmen, when he saw them taking their departure, to be destined for *Orleans*, and also from what he generally understood at *Zanesville* to be the course of the trade. He had frequent conversations with boatmen who were engaged in the trade on the river, and also had conversations with the young men who were employed to superintend the sale of flour, and his information as to the course of the trade, as above stated, is derived from these sources. To the admissibility of all which testimony, so far as the same refers or relates to the relative value of flour at *New-Orleans*, or so far as the same refers or relates to the relative value of the different qualities of flour at any place on the *Ohio*, other than at *Zanes-*

*ville,* the defendant objected.  Of which opinion was the court, and refused to let the said evidence go to the jury so far as above objected to.    Whereupon the plaintiff prayed the court to designate the particular sentences, passages, and parts of the testimony above stated, which were admitted and rejected.  Which the court refused to do further or more particularly than is done in the above stated objection and opinion.    To which opinion of the court, as stated in this exception, the plaintiff excepted.

9.  After the plaintiff had closed the evidence in support of the issue on his side, all which is set forth in the several preceding bills of exceptions taken on the part of the plaintiff, the defendant prayed the instruction of the court to the jury, that to enable the plaintiff to support his action in this case, it is necessary that he should prove, by competent evidence, the comparative value at *Zanesville* of the flour contracted to be delivered, and of that which was actually delivered at the time specified in the covenant; that the difference between these values constitutes at once the proof of damage, and the measure of that damage; that the plaintiff has offered no proof of such comparative value, and that in the absence of all evidence of that comparative value, the plaintiff is not entitled to a verdict in this case.    Which opinion and direction the court gave to the jury.    The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN, and DORSEY, J.

*Scott,* for the Appellant, contended, 1.  That the court below erred in not granting the *second* prayer contained in the *first* bill of exceptions; because the measure of damages was the difference of value at *New-Orleans,* at *the time of the inspection,* between the kind of flour contracted to be delivered, and the flour actually delivered as passed by the inspector of flour at *New Orleans.*

2.  That even if the court were right in refusing the *second* prayer contained in the *first* bill of exceptions; yet they erred in rejecting the evidence contained in the *second* bill of exceptions, and in the opinion therein expressed; because the evi-

dence contained in the *second* bill of exceptions was competent testimony to go to the jury, to prove the difference in value at *Zanesville*, between the flour stipulated to be delivered, and that which was delivered, at the time the flour was by the contract to have been delivered.

3. That the court below erred in not giving the opinion and direction prayed for by the plaintiff, as set forth in the *third* bill of exceptions; because, in the absence of all proof of the relative prices of superfine, fine, and common flour, at *Zanesville*, or at any other place on the *Muskingum* river, except at *Marietta*, the jury ought to have been permitted to take into consideration the relative value of the above mentioned qualities of flour at *Marietta*, it being the nearest point to *Zanesville* mentioned in the evidence.

4. That the court below erred in not giving the opinion prayed for by the plaintiff, as is set forth in the *fourth* bill of exceptions; because, in the absence of all proof of the relative value of superfine, fine, and common flour, at *Zanesville*, or at any other place on the *Muskingum* river, except at *Marietta*, the jury ought to have been permitted to take into consideration the relative value of the above mentioned qualities of flour at *New-Orleans*, with a proper allowance for the expences and risk of transportation. *New-Orleans* being a suitable and proper place for the inspection of the said flour.

5. That the court below erred in refusing to permit the evidence contained in the *fifth* bill of exceptions to go to the jury; because the evidence therein set forth was competent evidence to go to the jury, for the purpose of showing the value of superfine, fine, and common flour, at *Zanesville*, in 1817, at the time of the delivery of the flour mentioned in the *first* bill of exceptions; and that the kind of flour actually delivered was of no value for exportation.

6. That the court erred in refusing to permit the answer of *Maunsel White* to the plaintiff's *third* interrogatory to go to the jury, and in the opinion expressed in the *sixth* bill of exceptions; because the said answer was competent evidence to go to the jury, to show the difference in value between superfine, fine, common flour, and middling, at *New-Orleans*, in the spring of the year 1817.

7. That the court erred in refusing to permit the evidence contained in the *seventh* bill of exceptions from going to the jury; because the said evidence was competent testimony to go to the jury, to show the difference in value between superfine, fine, and common flour, at *New Orleans*, in the spring of the year 1817.

8. That the court erred in rejecting the evidence contained in the *eighth* bill of exceptions, or any part thereof, and in refusing to designate the particular sentences, passages, and parts of the testimony, contained in this bill of exceptions, which were inadmissible; because the whole of the said evidence was competent to go to the jury—1st. For the purpose of showing the relative value of superfine, fine, and common flour, at *New-Orleans*, in the spring of the year 1817. 2d. For the purpose of showing its value at *Zanesville*. 3d. For the purpose of showing that there was no flour inspection at *Zanesville* in 1817. And lastly. For the purpose of showing the state of the flour trade on the *Mississippi*, and its tributary waters, in the year 1817.

9. That the court erred in granting the prayer and direction contained in the *ninth* bill of exceptions. 1st. Because it was not necessary that the plaintiff should prove the comparative value at *Zanesville* of the flour contracted to be delivered, and of that which was actually delivered at the time specified in the covenant. 2d. Because the difference in value at *New-Orleans*, at the time of the inspection, between the flour actually delivered, and that contracted to be delivered, constitutes the measure of damages sustained by the plaintiff, and not the difference between the relative values at *Zanesville*. 3d. Because the plaintiff did offer evidence of such relative value at *Zanesville*, as well as at *New-Orleans*. 4th. Because even in the absence of all evidence of that comparative value, the court should have left the issue made up between the parties to the jury, whose particular province it was to decide whether the defendant had fulfilled and performed his contract. 5th. Because there was a contrariety of evidence as to the quality of the flour. 6th. Because if the jury were not satisfied from the evidence that the flour actually delivered was such flour as the plaintiff was entitled to under the agreement, although there

might have been an absence of proof by which the measure of damages could have been ascertained; yet that the plaintiff would have been at least entitled to nominal damages. 7th. Because the burthen of proof was with the defendant to show that he had kept and fulfilled his covenant. 8th. Because the evidence shows that the flour actually delivered did not pass inspection according to the stipulation contained in the contract.

On the *first* bill of exceptions, as to the construction of the contract, he cited 2 *Bac. Ab.* tit. *Covenant*, (F) 76. 3 *Com. Dig.* tit. *Covenant*, (D 1,) 262. 1 *Phill. Evid.* 416. 1 *Pow. on Cont.* 385. 2 *Com. on Cont.* 532. *Harper vs Hampton*, 1 *Harr. & Johns.* 672. *De Sobry vs De Laistre*, 2 *Harr. & Johns.* 228. As to the measure of damages to be allowed for the nonfulfilment of the contract, he cited *Cannell vs M'Clean*, 6 *Harr. & Johns.* 297. *Downes vs Back*, 2 *Serg. & Low.* 407. *Bridge vs Wain*, *Ib.* 486. *Bracket vs M'Nair*, 14 *Johns. Rep.* 170. *Amory vs M'Greggor*, 15 *Johns. Rep.* 24.

On the *ninth* bill of exceptions, he cited *Douglass vs M'Allister*, 3 *Cranch*, 298. *Hurstford vs Wright*, 1 *Day's Rep.* 3. *Davis vs Davis*, 7 *Harr. & Johns.* 36. *Morris vs Brickley & Caldwell*, (*ante* 107.) *Stanard vs Eldridge*, 16 *Johns. Rep.* 254.

On the *second*, *fifth*, and *seventh* bills of exceptions, he cited 1 *Phill Evid.* 209, (227,) *ch.* 8. *Ib.* 167, *ch.* 7, *s.* 6. 2 *Phill. Evid.* 45. 1 *Stark. Evid.* 398, 399, 400.

On the *eighth* bill of exceptions, he cited 3 *Stark. Evid.* 1252.

*Meredith*, for the Appellee. It is contended by the appellee, that he has kept his covenant, and performed the contract. He does not hold himself bound by the construction given by the court to the contract, as stated in the *first* bill of exceptions. That the contract, if it looks to an inspection at all of the flour, it was that it should be inspected at *Zanesville;* and if no public inspection there, then there was to be a private inspection. It never was intended that the flour was to be sent to *New-Orleans* at the risk of the appellee For the purpose of this argument, however, it must be admitted by the appellee, that the court below gave a proper construction to the contract. The whole case

before this court is, what was the proper measure of damages? The contract is a written one, and it must be construed by the court. The measure of damages is legally incorporated into every contract; and the rule given by the court below, as to the measure of damages, was the proper rule. The defendant did not subject himself to the fluctuations of a foreign market. He stipulated to deliver the flour at *Zanesville*, and there he did deliver it. If he had failed altogether to deliver the flour, what would have been the measure of damages? Not what would be the price at *New-Orleans*, or any foreign market, to which the plaintiff might have intended to ship it; but the standard of value would be fixed at *Zanesville* at the time when the contract was to be consummated. *Chipman on Contracts,* 121, and the cases there referred to. *Shepherd vs Hampton,* 3 *Wheat.* 200. *Gainsford vs Carroll,* 9 *Serg. & Low.* 204. *Leigh vs Paterson,* 8 *Taunt.* 540, *(4 Serg. & Low.* 204.) 2 *Stark. Evid.* 645, 646. *Gilpins vs Consequa,* 1 *Peters' C. C. Rep.* 94. *Willings & Francis vs Consequa, Ib.* 172. *Smith vs Richardson,* 3 *Caine's Rep.* 219. But it has been said that the contract was not completed until after the flour was inspected at *New-Orleans*. The contract stipulates that the flour should be delivered at *Zanesville;* and it was delivered there to the plaintiff, who sent it to *New-Orleans*. Suppose the flour had been lost in its transportation, would the defendant be bound to supply other flour of the same or any other quality? If the measure of damage was the value of the flour at *Zanesville*, then the plaintiff should have produced evidence of what was the value at *Zanesville*. This he did not do; although such evidence might have been obtained. No evidence short of that required could be received.

If there ought to have been nominal damages in this case, this court, under the act of 1809, *ch.* 153, are authorised to amend the proceedings so as to give nominal damages.

*Taney,* in reply. The construction given by the court below to this contract on the first prayer of the plaintiff, is the true one. We must take it with its consequences. The contract was to deliver flour which should pass inspection, 1-3d fine, 2-3ds superfine. These latter terms imply a public inspection,

for private opinion could not pass the flour, as either fine or superfine. The purport of an inspection is to give an article a fixed character. The value of the flour was to be so fixed in the market by the intent and contract of the parties. The inspection was to influence the market value. This quality of fine and superfine to be fixed by inspection, was to be attached to the flour at *New-Orleans*, the only place for inspection; and was to be conclusive between the parties. We admit that the time and place of the breach, the difference in value then and there, will furnish the measure of damages. *Dillon* warrants the flour shall pass, and therefore he covenanted that *Williamson* might take the flour to *Orleans*, the usual place of inspection, where of course it was to pass. His, *D's*, covenant is of that extent. The flour does not pass; that is a breach of the covenant, not of delivery; but that it would pass inspection at *Orleans*. The time of the breach then, is the time of the inspection; the place, is the place of the intended inspection, and that was *Orleans*. It is a mistake to confine the breach to the mere delivery of uninspected barrels. We claim our damages, therefore, for the injury sustained at *Orleans* at the time of the inspection and discovery that our contract had been violated. Neither would it be correct to apply to the breach arising from a failure to pass inspection, the same measure of damages as for a nondelivery. In the latter case the purchaser, not having parted with his money, can replace the article, and the difference of price, at the place of delivery, would fully remunerate him. To this last case a failure to deliver stock sold to be delivered at a future day, is analogous; but the true measure of damages in this case is the equity which the purchaser has to reimbursement under its peculiar circumstances. *Bridge vs Wain*, 2 *Serg. & Low.* 486. 1 *Stark. Evid* 504.

The sufficiency of the evidence alone was for the consideration of the court; all the bills of exceptions might have constituted one. There is no one prayer as to the sufficiency of the evidence; but they all go as to the admissibility of the evidence. It is clear that the plaintiff could give, and that he did give evidence that the price of flour on the river was regulated by the price at *New-Orleans*, and he proved the relative value at each place, except at *Zanesville*. The evidence was cer-

tainly admissible, but whether sufficient or not, was another question, and which was for the jury to decide.

On the *eighth* bill of exceptions, he cited 1 *Stark. Evid.* 395. 3 *Stark. Evid.* 1244, 1245.

On the *ninth* bill of exceptions.  Where there is a breach of the covenant by the defendant, there must be a verdict for nominal damages at least.  The act of 1809, *ch.* 153, cannot authorise this court to amend the judgment.  The judgment is for the defendant, and it may be amended so as to support that judgment; but by amending it by giving nominal damages to the plaintiff, would be to reverse the judgment.

MARTIN, J. delivered the opinion of the court.  This was an action instituted to recover damages for the nonperformance of a covenant entered into between the parties on the 25th of January 1817, in the following words, (and which was signed and sealed by them:)—"Memorandum of an agreement entered into on this 25th day of January 1817, between *Moses Dillon*, of *Zanesville*, state of *Ohio*, and *David Williamson* of *Baltimore*, state of *Maryland*, whereby the said *Moses Dillon* obligates and binds himself to deliver to the said *Williamson*, or order, at *Zanesville*, two hundred and fifty barrels of flour, not less than one-third of same flour *to pass* as fine quality, the remaining two-thirds of superfine, *to be at said place by the first day of March next*, to be lined and in good shipping order; and *to deliver on the 15th of same month*, two hundred and fifty barrels of flour of same quality as the first mentioned quality, and in like order, to the said *Williamson*, or order, *at the above named place*, for which flour, *on its delivery as above*, the said *David Williamson*, Jr. binds and obligates himself to pay to the said *Moses Dillon*, or order, the sum of seven dollars per barrel, for which flour payment will be made to the said *Dillon* with his bonds passed to *Luke Tiernan* and *Kennedy Owen*, of *Baltimore*, interest being added in said bond to the day of *the delivery* of said flour, at the par of exchange.  In testimony," &c.

In the trial of this cause, many exceptions were taken to opinions given by the court below; and without following the regular order, in which they appear, we will decide the points

that arise in them, and then apply the law to each exception respectively.

The true construction of this contract is the first question to be examined.

That the intention of the parties making a contract is to be regarded, and when practicable, carried into effect, is a fundamental rule in the construction of contracts. Where the agreement is in writing, and an ambiguity appears, not on the face of the paper, you may have recourse to extrinsic evidence to aid in its construction; but where its language is clear and explicit, the instrument must be construed according to its plain import and terms. In this case we see no ambiguity, and we think the agreement, on the face of it, clearly points out the intention of the parties contracting

The contract is for the delivery of a certain quantity of flour, of a particular quality; to be delivered—where? The contract expressly states, *at Zanesville.* When was it to be delivered? It is equally explicit that the first 250 barrels were to be delivered on the 1st of March 1817, and the remainder on the 15th of the same month, and *Williamson* stipulated that he would pay for the said flour seven dollars a barrel, *on its delivery as aforesaid.* But the flour, thus to be delivered *on the 1st and 15th of March at Zanesville,* was to be of a particular quality, and the agreement points out the evidence by which the quality shall be ascertained; it shall be such flour *as will pass inspection,* &c. The inspection was no part of the contract, *as it related to the time or place of delivery,* but only the evidence or test by which it was agreed the quality of the flour should be ascertained. Suppose on the day after the flour was delivered, *Williamson,* under an impression that it was not of such quality as was specified in the contract, had instituted a suit against *Dillon,* can it be doubted that such suit could be sustained, although the flour had not *then* been inspected, if *afterwards,* upon inspection, it would not pass? The moment the stipulated time for the delivery of the flour had passed, the contract was either performed or broken, and it was only necessary to carry it to *New-Orleans,* or any other place, for inspection, to furnish evidence of its quality.

With this explanation of the contract we are next to enquire

*at what time and place* the price of flour was to be the measure of damages; and with this view, it is necessary to consider, not only what the contract is, but what it is not.    It is not a. contract for the delivery of *stock,* and therefore the case of *Downes vs Back,* 2 *Serg. & Lowb.* 407, and the case of *M'Arthur vs Lord Seaforth,* 2 *Taunt.* 257, do not apply to it.    By this contract the price was to be paid when the flour was delivered.    It is not for affreightment, and, therefore, not within the doctrine laid down in *Bracket vs* M'*Nair,* 14 *Johns. Rep.* 170, and *Amory vs* M'*Greggor,* 15 *Johns. Rep.* 24, even if the authority of those cases had never been questioned; nor is it a contract for the sale and delivery of articles where *no time or place* is specified for the delivery, as in *Bridge vs Wain,* 2 *Serg. & Lowb.* 486.    These are cases decided upon principles not applicable to the one now betore us, and we look in vain to *them* to aid us in forming a correct opinion in this case.

It is believed that no case can be found where there was an agreement to deliver a *specific* article at a *particular time and place,* and the money to be paid at the time of delivery, that the value of that article, *at the time and place of delivery,* was not considered the measure of damages, unless where the contract showed it was for a particular purpose, and special damages were laid in the declaration.    In *Chipman on Contracts,* 121, it is stated, "If property be sold at a particular price, to be delivered at a future day, and in the meantime the property rise, the purchaser is entitled to the rise of property; and if the property be not delivered, the value of the property, *at the time and place of delivery,* is the measure of damages." And in *Shepherd vs Hampton,* 3 *Wheat.* 200, "It was the unanimous opinion of the court, that the price of the article, *at the time it was to be delivered,* is the measure of damages." See also the case of *Leigh vs Patterson,* 4 *Serg. & Lowb.* 204.    *Gainsford vs Carroll and others,* 9 *Serg. & Lowb.* 204, and *Cannell vs* M'*Clean.* 6 *Harr. & Johns.* 297.

The same rule, we think, will apply, where the damages are claimed, not for the nondelivery of the article, but for the delivery of an article of a *different quality* from that contracted to be delivered.    The difference of price, *at the time and place*

*stipulated for the delivery* between the article delivered and that contracted for, is the measure of damages.

The case of *Gilpins vs Consequa,* 1 *Peters' C. C. Rep.* 86, sustains this position. That was an action brought to recover damages for the nondelivery of teas, of the *quality* contracted to be delivered, by *Consequa,* the defendant, to the supercargo of *Gilpins.* *Consequa* stipulated to deliver at *Canton* a cargo of tea for the *Pennsylvania* Packet, *to be fresh, prime, and of the first chop.* The tea was delivered, and carried first to *Philadelphia,* and afterwards to *Amsterdam,* where it was sold at public sale, according to the usage. From a comparison of the sales, it appeared these teas sold for less than some other teas of the same kind, which was attributed to their being of *inferior quality.* Judge *Washington* charged the jury, that as the contract was to deliver teas *at Canton* of a certain quality, they would consider the sales at *Amsterdam,* and the comparison of them with those of other teas, not as furnishing the *amount,* but the *rate* of loss; and having ascertained the rate, to apply it to the prices of the same articles of first quality at *Canton,* when these teas were delivered. And the learned judge, in illustration of this doctrine, stated—"If a man contract to deliver a quantity of flour, for instance, by a particular day, and fails, or deliver it of a quality inferior to that stipulated for, all that can be claimed from him in the first case, is the price of such flour *at the time and place* when and where it was to be delivered; or in the second, to make up the difference in quality." In the case of *Willings & Francis vs Consequa,* 1 *Peters' C. C. Rep.* 176, the doctrine laid down in the first case is recognized and adopted. Speaking of the rule in *Gilpins vs Consequa,* the Judge says, "with this rule the court finds no cause to be dissatisfied; and the reason of it is obvious, the contract is to deliver teas of the best quality *at Canton;* if it be not complied with, the price of such teas, at that place, is the just measure of the damage sustained by the plaintiff."

But it is thought this rule, to ascertain the damages, will not afford to the plaintiff ample justice; he ought also to recover the amount of expenses necessarily incurred in transporting the flour to *New-Orleans* for inspection. The answer is, such was not the contract. If that had been a stipulation between the

parties, it should be found in the agreement. In its absence, this court can only act upon the contract as they find it, and apply to such contract the general established principles of law.

The next question is, whether the testimony offered by the plaintiff was admissible for that purpose?

Through the whole trial of this cause, the court of *Baltimore* county seems to have acted under the impression that no testimony was admissible to prove the relative price of flour at *Zanesville*, unless it was direct, positive proof, from a witness, who knew the value *at that place*; and that in the absence of such positive proof, the jury could not be permitted to establish that fact, by any other testimony. In this, we think the court erred. The evidence offered is not, as was contended, secondary evidence. It is of the same grade with that required by the court, although perhaps of a less conclusive character. Where testimony is offered, which of itself shows there is other evidence of a higher character, it is secondary evidence; as in the case of a written agreement—the copy is not admissible, until you first show the original cannot be had; because the copy of itself clearly proves, there is evidence of a higher character, which ought to be produced, unless its absence is accounted for. Not so, where the testimony is of the same grade, although it may not have an equal effect with the jury. The object to be attained in this case, was the relative value of flour at *Zanesville*, between that delivered, and that contracted for; and this might be proved either by a witness who knew the price of each kind of flour at *Zanesville*, or by showing the value at different places, by which the jury could judge of its relative value at *Zanesville*. The testimony, therefore, offered by the plaintiff, of the price of each kind of flour at *New-Orleans*, *Marietta*, and other places, was admissible, and ought to have been given to the jury.

The evidence offered in the *fifth* bill of exceptions was hearsay; and, therefore, properly rejected by the court. Some difficulty arises in forming a decision on this exception from the want of care in taking down the evidence. The witness, after stating that "he had purchased flour at *Zanesville* in the spring of 1817, and paid for it from six to eight dollars a barrel, and that he had paid for the freight of flour from *Zanesville* to

*New-Orleans* two dollars per barrel," said, that all the information he had as to the purchases and prices was derived from his brother and partner; but it is not distinctly mentioned whether the prices spoken of related to the price of flour alone, or was intended to include the price of both flour and freight from *Zanesville* to *New-Orleans*. From a comparison of the several parts of the testimony, we are led to the conclusion, that his knowledge of both was derived from the same source. He was not in the *Western Country* in the spring of 1817, nor did he make the purchases himself, but the whole business was transacted by his brother and partner.

The court were also right in not receiving the testimony in the *sixth* bill of exceptions. *Maunsel White*, the witness, stated, "that he was called on in the spring of the year 1817, by *Richard Relf*, to state the difference usually allowed on the sale of flour between superfine, fine, common and middling; *that he then stated* the difference was as follows," &c. This might be true, and yet he might have no knowledge of the facts. He only swears *he made the statement* to *Relf*, but he does not swear that statement was true, or that he either then knew, or ever did know, the facts to be as he stated them to *Relf*.

The testimony offered in the *seventh* bill of exceptions was hearsay, and, therefore, liable to the same objection with that contained in the fifth.

That part of the evidence in the *eighth* bill of exceptions that relates to the price of flour in *New-Orleans* in 1817, and that which was offered to prove there was no public inspection at *Zanesville*, at or *before* the time mentioned, ought to have been received; the residue of the testimony mentioned was properly rejected. The price of flour in 1811 and 1819, could not afford a correct standard to show its value in 1817.

We concur in the opinions given by the court below, in the *first, fifth, sixth,* and *seventh* bills of exceptions, and dissent from those in the *second, third, fourth, eighth,* and *ninth* bills of exceptions.

DORSEY, J. dissented from the opinions of the court below in the *first, third,* and *fifth* bills of exceptions.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.