# TAKOMA PARK BANK *v.* LEROY ABBOTT

[No. 3, January Term, 1941.]

250

*Decided April 9th, 1941.*

*William D. Macmillan,* with whom were *Leonard J. Ganse, D. Eugene Walsh, and Semmes, Bowen & Semmes,* on the brief, for the appellant.

*James E. Boylan, Jr.,* with whom was *William C. Sullivan* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

The appellee, LeRoy Abbott, recovered a judgment against the appellant, Takoma Park Bank, Inc., in a jury trial in the Circuit Court for Carroll County, in the amount of $50,500 for the loss of fifty $1000 gold certificates and five $100 notes which he had placed in a safe deposit box in the vault of the appellant bank, which he had rented from it, and which he alleged was abstracted therefrom as a result of negligence and default of the appellant, in not using reasonable care and diligence in guarding and safe keeping said box. The appeal is taken from that judgment. Twenty-five exceptions were taken by the appellant to the rulings of the trial court. A part of the testimony follows:

LeRoy Abbott, the appellee, testified on direct and cross-examination that in 1919 he married Bessie M. Weber from whom he was separated in 1936. Some time in the fall of 1925 or 1926, his aunt, Carrie Points, came to his office and handed him an envelope and told him to put it away for future use, that she was so glad that

he was improving himself in his line of business and to see that he was climbing up the ladder instead of going down, and when she handed him this envelope, she told him to put it away until a future date, that he was too young to appreciate its value. He further stated that several times he and his wife had been separated, and that Carrie Points would come and give him a lecture like a mother would, and if he was busy in the office, she would hand him a note to read and go on away. He took the envelope home and kept it in his cupboard until he acquired a gasoline station at 14th and Quincy streets, Washington, and at that time, he put it in an iron safe at that place. On the 14th of July, 1936, he and his wife separated and about that time, in looking for some insurance policies, he came across the envelope, which was of heavy manila paper, brown and had two little seals on it and sealing wax. He opened the envelope and found in it fifty $1000 bills, gold certificates, an ear ring, a diamond ring and a note. The note, from his aunt, Carrie Points, related that Gene's father had practically raised the family but that he had gotten the boys all their jobs, and that she thought he was justly entitled to it to repay for what he had done for his mother and family since he had been working. The note further indicated that the money had come from a safe deposit box which she and her sister, Nancy Hobbs, had in Baltimore. He further testified that Carrie Points died in 1927, and at that time she was rooming in a rooming house in N. E. Washington and that she had formerly lived with her son-in-law William Towers, a grandson, and her daughter. Nancy Hobbs was his father's sister, who at one time lived in Baltimore and then went back to Philadelphia to live where she died. He stated that when he opened the envelope in July, 1936, this was the first time he knew about the money being in the envelope and he then decided to sell the store, which he later did. In payment, he received a note, a check for $3762, some cash, and a boat. He testified that he had a man working for him in the store, James Payne, who asked him three or four times why he

was selling the business, that Payne said it was a good paying business and wanted to know why it was being sold. He took Payne upstairs and went in the cupboard and opened the safe and got out the box, opened the envelope, counted the money and showed it to Payne. He resealed the envelope and put it back in the box and he did not open it again until on August 17th when he went to the bank. James Payne later testified that he saw the envelope containing the fifty $1000 gold notes. Appellee further testified that he had previously had checking and savings accounts with the Takoma Park Bank, appellant. On August 17th, 1936, after he had sold his business he went to the appellant bank, deposited $2762 to his checking account and the bank book offered in evidence proved this deposit, and received from the cashier ten $100 bills. He then opened a savings account with a deposit of $200. He stated that the reason he did not deposit the gold certificates was because of the trouble he had with his wife and he was afraid that she would find out that he had this money. He further stated that he did not know at that time that the bills or gold certificates should be turned in to the Treasury and exchanged. After making the deposit, he went to the safe deposit box department, where the women attendant in charge is behind a grille. He was admitted by this attendant and he rented a box for three years and stated that he was going to leave Washington and did not know exactly when he would be back. He further testified that he placed in the safe deposit box the $1000 he had received from the cashier and the envelope containing fifty $1000 gold certificates, an ear ring and a diamond ring. He signed a contract of rental which provided that no one other than the renter shall have access to the safe deposit box. The women attendant came back with the receipt signed H. Funkhauser, and at that time he had finished putting his personal belongings and other things into the safe deposit box and she put the box in the vault, gave the key a turn and handed him two keys to the box. He stated that the safe deposit box was black mental, two or three inches

high, about four inches wide and about eighteen inches long. It had a little hook on one end and the lid was hinged.

He visited the bank at various times and entered his safe deposit box. He was not able to give the exact amounts and dates, but took out $100 or whatever he needed at that particular time, and the last time he saw the box was on November 30th, 1937.

As to the visit to the bank on November 30th, 1937, the appellee's testimony follows. On that date he went to the bank and after the attendant had used the guard key and his key, his safe deposit box was handed to him by the attendant, and he went to a table behind the grille and in front of the vault, and one gentleman was standing at the end of the table, because of which he used the end nearest the vault door and took out $200. He then counted the bills in an envelope and there were $500 left, and at that time the envelope was in the box, containing fifty $1000 bills, an ear ring and a diamond ring. He left the gentleman standing there, put the box away in the depository, locked it and the attendant was at the door and let him out of the safe deposit box room. He then walked over to a line and waited for a couple of people to make deposits and put his deposit through the window and turned around and walked on out. His bank book offered in evidence shows a deposit on that date.

He further said that on December 13th, 1937, he went to the Morris Plan Bank and saw a Mr. Collegeman and asked him if he could dispose of one of the $1000 certificates. He was asked how many of these certificates he had and when told he had fifty, he was advised to get counsel. Pursuant to that advice, that afternoon he called Henry F. Woodward, an attorney, and was advised to go to the bank in the morning of the 14th to get the box and take it to him, and he would take it to the Treasury. On December 14th, 1937, appellee went to the bank to the door leading to the safe deposit box room, and rang the bell and while he was signing the register, the lady took his key and opened the safe deposit door

and as he turned around from registering, she had the door open and she said "there is no box there, you must have left it outside in one of the booths." The attendant called the assistant cashier, a Mr. Gates, who asked him what happened to the box and appellee told him that he did not know. Gates asked what was in it and also asked him why he came to the bank so early in the morning. Appellee then told him that he had seen Woodward, his attorney, the night before and he sent him to get the package. The official asked what the box contained and appellee replied that he would like to get in touch with his counsel and see what he says to tell you. Gates called Mr. Woodward on the telephone and the appellee talked to Woodward and was told to give the official a full list of the contents of the box. He then gave him a list of the contents which were fifty $1000 bills, gold certificates, five $100 bills, a diamond ear ring, a finger ring, some insurance papers and a couple of old income tax reports.

The next morning appellee and Mr. Woodward went to the bank and saw Mr. Gates, and Woodward was shown the registry of the safe deposit boxes, and Woodward related to Gates that Abbott had told him about the gold certificates and that he suggested to Abbott to go to the bank the next morning and get from the safe deposit box the $50,000 in gold certificates and bring them to him, and he would take them to the Treasury Department and explain why they had not been turned in. Woodward then asked to see one of the officials of the bank. A few minutes later, an official, who later proved to be Mr. Harvey W. Turnage, executive vice-president, came down and had a conversation with Mr. Woodward in the presence of the appellee and Gates, in a private room, and, as related in part of the testimony, the bank official said that he had nothing to worry about because the bank was covered by insurance and they could sue.

Hazel Funkhauser, a witness produced by the appellant, testified that she was an employee of appellant as proof desk clerk and was assistant to Mrs. Adler when

she was at lunch or was busy with her work. She testified that she waited on Abbott, the appellee, when he came to the bank on August 17th, 1936, and rented a safe deposit box. She further testified that she got the key number 648 from one of the safe deposit boxes in the vault where the keys are kept that are not in use, and in order to get in the safe deposit box it is necessary to use both a guard key and the key to the box. The guard key was kept by Mrs. Adler, who had charge of the safe deposit boxes in her cage back of the grille, and the key to the box where the unused keys are placed was kept in a money drawer in Mrs. Adler's cage and sometimes hangs right beside her and is available to all employees of the bank. She further testified that on November 30th, Mr. Abbott came to the bank late in the afternoon, pressed the buzzer and, Mrs. Adler being busy, she went back, took Mr. Abbott behind the grille, used the guard key, made a complete turn and then took his key and made the half turn which opened the door, that either she or Mr. Abbott took the box out to the coupon booths and went back to her desk to the other part of the bank and that she did not see Mr. Abbott any more. She further stated that the guard key makes a complete turn and then Mr. Abbott's key makes a half turn and in order to lock the container for the box, it was only necessary for Mr. Abbott to turn his key back. It was pay day and the vault and bank remained open until six o'clock in the afternoon.

We will first consider the prayers. The plaintiff offered three prayers; the first and second as modified and the third as modified were granted. The defendant offered nine prayers. The defendant's first, one-A, second, second-A and third prayers were granted. The defendant's B, C, and fourth and fifth prayers were refused.

Of the twenty-five exceptions taken by the appellant, the last relates to the ruling of the Court upon the prayers. This court decided in the case of *Security Storage Company v. Martin,* 144 Md. 536, 125 A. 499, that the relation existing between the lessor and lessee

of a safe deposit box is that of bailor and bailee, and further that failure to deliver and account for the contents of the safe deposit box should be treated as *prima facie* evidence of the negligence of the defendant in not exercising ordinary or reasonable care and diligence in the safe keeping of the contents of the box. We feel that the facts in the instant case are sufficiently similar to those in the case of *Security Storage Company v. Martin, supra,* as to make the same rulings applicable and as the plaintiff's prayers as amended, are substantially the same as in that case, the ruling of the court on those prayers was correct. The defendant's fourth and fifth prayers were substantially the same as the second and fourth prayers of the defendant in the case of *Security Storage Company v. Martin, supra,* and under the decision of this court in that case, were properly refused. The defendant's B prayer was the usual demurrer prayer and for the same reason we agree with the ruling of the trial court on that prayer. The defendant's C prayer we will discuss later in this case.

The defendant filed two pleas, the first plea being the general issue plea. The second plea was a special plea reciting that plaintiff had no interest, legal or equitable in the fifty $1000 gold certificates of the United States of America because he held them in violation of Section 5 (b) of the Act of Congress of October 6th, 1917, as amended by section 2 of the Act of Congress of March 9th, 1933 and the Executive Order No. 6260, section 5, dated August 28th, 1933, and is not legally entitled to maintain his action to recover damages, interest, and profits for the alleged loss thereof. To this second plea the plaintiff demurred and the demurrer was sustained.

Was the court correct in sustaining this demurrer? Section 5 of the Executive Order No. 6260 above referred to provides that after thirty days from August 28th, 1933 no person shall hold or retain any interest, legal or equitable, in any gold coin, gold bullion, or gold certificates situated in the United States and owned by any person subject to the jurisdiction of the United States, except under

license therefor issued pursuant to this Executive Order. The special plea did not state that the plaintiff did not have a license. "To constitute a good plea in bar, the matter pleaded, must, if true, afford a full and complete answer to the action and show that there is no right of recovery." *Glenn v. Williams,* 60 Md. 93; *Carroll v. Bowen,* 113 Md. 150 at page 154, 77 A. 128. Section 3 of the Act of March 9th, 1933, supra, also directs that the Secretary of the Treasury shall pay therefor an equivalent amount of any other form of coin or currency issued under the laws of the United States, and although the gold certificates in this case were held after thirty days from August 28th, 1933, in order for confiscation to take place, it appears that intent to violate the Act must be shown. *United States v. 98 $20 United States Gold Coins et al.,* 20 Fed. Supp. 354. The case of *Schmidt v. Twin City State Bank,* 151 Kan. 667, 100 P. 2nd 653, is cited by the appellant but in that case, at the conclusion of the plaintiff's case, the defendant filed a motion to strike from the record all evidence concerning gold coins. Further, the special plea does not answer the whole declaration because there is no defense set up therein to the loss of $500 in currency. *Mitchell v. Sellman,* 5 Md. 376. Unless the plea expressly states that it is intended only as an answer to a part, it will be taken as extending to the whole, and will necessarily then be held bad on demurrer, unless it presents a good defense to the whole. 1 *Poe Pl. & Pr.* sec. 664. We must also note that, as above stated, based on the ruling in the case of *Security Storage Company v. Martin, supra,* the relation of bailor and bailee existed and that a bailee cannot dispute the bailor's title. *Van Zile, Bailments & Carriers* (2nd Ed. 1908), sec. 20, pp. 17-18. We, therefore, concur with the trial court in sustaining this demurrer to the second plea. The demurrer to the second plea having been sustained, the defendant's C prayer based on the second plea was properly rejected.

The seventh exception was taken when the trial court sustained the objection of the plaintiff to the cross-ex-

amination of the appellee concerning a women on the boat with him, the manner in which he lived in Florida, and the service of process in a divorce action instituted by his wife. We cannot see that these are relevant matters to the issue in this case. It is true that a witness may be cross-examined upon all matters material to the issue, but this rule has its qualifications and much must be left to discretion of the presiding judge in determination of this question. *Black v. Bank of Westminster,* 96 Md. 424, 54 A. 88; *Iron Clad Mfg. Co. v. Stanfield,* 112 Md. 360, 387, 76 Atl. 854.

During the trial the appellant called the appellee as a witness under the provisions of chapter 380 of the Acts of 1939, and the ninth and tenth exceptions were taken when the court refused to permit the appellee to be asked whether he suspected there was money in the envelope handed to him by Mrs. Points and why he waited for such a long time to open the envelope, and whether he was surprised. to find the money when he opened the envelope in July, 1936. These questions had been gone into by the appellee on examination in chief and he had been cross-examined on them and the rulings of the trial court were correct. The purpose of chapter 380 of the Acts of 1939 was not to allow the repetition of testimony. The eleventh and twelfth exceptions were taken when appellant was not allowed to question appellee (a) whether his aunts ever possessed $50,000; (b) as to the heirs and distributees of Carrie Points and Nancy Hobbs. He had previously testified to some of these facts on cross-examination by appellant. We cannot see that this line of inquiry was relevant. The fourteenth and fifteenth exceptions were taken when the court refused to permit Adolph E. Landers, a witness offered by the appellant, to answer the following questions: "Q. You saw some man, would you say how he was dressed?" "Q. While you were there at the table so checking on your box, did any man come in the same room at the same table while you were there and examine his box?" As this witness had previously testified that

he could not identify the man that he saw in the coupon room, we cannot see the force of these exceptions. The sixteenth exception was taken upon the refusal to allow Mary Etheridge, who operated a rooming house in Philadelphia, to testify as to whether Carrie Points came to the rooming house after the body of Nancy Hobbs. This testimony was not pertinent to the case. The seventeenth, eighteenth and nineteenth exceptions were reserved upon the refusal of the court to allow records as to the administration of the estates of Nancy Hobbs and Carrie Points and the bankruptcy petition of Solon L. Hobbs to be offered in evidence. These inquiries were not relevant in the instant case. The twentieth and twenty-first exceptions were taken on the refusal of the court to allow Mary Etheridge to testify as to the circumstances of the death of Nancy Hobbs and whether or not after her death any of the relatives came to see her. The twenty-second exception was taken to the refusal of the court to allow the same witness to testify whether Nancy Hobbs was a women of any means. The answers to these questions were given and went to the jury. It is presumed that the court, in ruling on collateral matter, did its duty and all reasonable presumptions necessary to uphold its rulings will be indulged. *Brooke v. Winter,* 39 Md. 508; *Md. Elec. Ry. Co. v. Beasley,* 117 Md. 270 at page 277, 83 A. 157; *Baltimore & Ohio R. Co. v. State,* 107 Md. 642; 69 A. 439.

The subject of the twenty-third and twenty-fourth exceptions is based on the refusal of the court to allow James Pearre Wantz, Sr. President of the Union National Bank of Westminster, to answer a hypothetical question as to the degree of care that would ordinarily be exercised by persons and corporations engaged in the same business as appellant and under similar circumstances. The court was correct in sustaining this objection as the question propounded was not based on the testimony taken in this case. We quote from *Northern Central Railway Co. v. Green,* 112 Md. 487, 505, 76 A. 90: "A

hypothetical question must embrace every material element of the hypothesis founded upon the evidence, and it must not import into the question any element not founded upon the evidence in the case. If it offends in either respect it is defective and it is error to permit such a question to be answered, and, if inadvertently admitted over an objection, it is error to refuse a motion to strike out the answer." *Balto. & O. R. Co. v. Brooks,* 158 Md. 149, 160, 148 A. 276, 280; *Mathiesen Alkali Works v. Redden,* 177 Md. 560, 565, 10 A. 2nd 699.

The second exception was taken when the court admitted in evidence a statement made by Woodward, in the presence of the appellee, to Gates early on the morning of December 15th, that Abbott had told him about the gold certificates, and that he suggested to Abbott to go to the bank the next morning and get from the safe deposit box the $50,000 in gold certificates and bring them to him, and he would take them to the Treasury Department and explain there why they had not been turned in. The fourth exception was taken to the refusal of the court to grant a motion to strike out this evidence. The rule is well established that declarations of a party favorable to himself are not admissible unless made in the presence of the other party or as a part of the *res gestae,* or in contradiction of the evidence previously given. *Williamson v. Dillon,* 1 H. & G. 444; *Hagan v. Hendry,* 18 Md. 177; *Knight v. House,* 29 Md. 194; *Thompson v. Bowman,* 6 Wall. 316, 18 L. Ed. 736; *Jones v. Dugan,* 124 Md. 346 at page 350, 92 A. 775; *Walkling v. Walkling,* 162 Md. 188, 190, 159 A. 264. However, if the appellant was prejudiced by the admission of this evidence, the error has become harmless because, when appellant called appelle as its own witness, they examined him in chief upon this conversation with Woodward.

The first, third, fifth, sixth and eighth exceptions will be considered together, inasmuch as all of them relate to the action of the trial court either in admitting over appellant's objection a statement made by an executive vice-president of appellant, or in refusing to withdraw a juror and declare a mistrial because of the statement.

In considering these exceptions, the general rule to the effect that courts assume evidence offered by a plaintiff as true only for the purpose of testing the right to have his case submitted to a jury must be kept in mind, and the court does not pass upon or vouch for its truth for any other purpose, because it becomes a function of the jury to find the facts under proper instructions from the court. With this rule in mind, it is sufficient to state that after appellee on December 14th, 1937, had been admitted by a bank attendant to the vault where his safe deposit box was locked and the door to the box had, in his presence, been unlocked and the compartment in which he kept his securities was not there, an assistant cashier of the bank was called by the attendant. The assistant cashier asked appellee what was in the box, and because he had learned from Mr. Woodward, an attorney, that the $1000 gold certificates should have been turned in to the U. S. Treasury, he did not like to disclose the contents until talking to the attorney, who immediately was called upon the telephone and advised Abbott to tell them exactly what the box contained. This he did, and on the following morning Abbott and Woodward reappeared at the bank and requested to see one of the officials. At that time the bank's officials were attending a board meeting, but within a few minutes Mr. Harvey W. Turnage, an executive vice-president of appellant, appeared. This last named official, Mr. Gates, Mr. Woodward, and Mr. Abbott retired to a private office to discuss the matter with the executive vice-president, who stated to appellee and his counsel, according to some of the testimony, that he had nothing to worry about, because the bank was covered by insurance and they could sue the bank.

Specifically, the first, third and sixth exceptions were taken to the court's action in admitting in evidence the above statement of Mr. Turnage, the executive vice-president of appellant, while the fifth, sixth and eighth exceptions were reserved at the trial court's refusal to grant appellant's motions to withdraw a juror and declare a mistrial.

This court has, in line with a majority of the courts throughout the country, recognized the impropriety of injecting into the trial of a case a suggestion that the defendant was covered by insurance, because to do so had a tendency to prejudice jurors and cause them to regard the insurer as the real defendant. *Hall v. Trimble,* 104 Md. 317; *Kirsch v. Ford,* 170 Md. 90; *Gwynn Oak Park v. Becker,* 177 Md. 528; *Ice Machinery Corp. v. Sachs,* 167 Md. 113; *Yellow Cab Co. v. Bradin,* 172 Md. 388; *International Co. v. Clark,* 147 Md. 34, 127 A. 647; 8 *Couch on Insurance,* sec. 2254. But this rule is not without its qualifications and limitations. For instance, it is rarely ever applied, even when insurance is improperly suggested, if the trial court admonishes jurors to disregard the statement relating to insurance. *Gwynn Oak Park v. Becker,* 177 Md. 528, 10 A. 2nd 625. Nor is the rule strictly applicable in situations where the statement relating to insurance is practically unavoidable. *Yellow Cab Co. v. Bradin, supra.* Moreover, in view of the presumptive knowledge on the part of present-day jurors that public liability insurance is required to be carried by persons engaged in certain lines of endeavor, as well as the knowledge on the part of jurors that persons of business prudence and discretion often carry such insurance, the present-day tendency is toward the relaxation of the strictness of the rule first announced. *Couch on Insurance, supra; International Co. v. Clark, supra.*

In *Yellow Cab v. Bradin, supra,* the agent of an insurance company solicited releases from the injured plaintiffs, and on cross-examination stated he was employed by Markel Service; further, over objection, he was permitted to state that Markel Service was an insurance adjustment agency. The court refused defendant's motion to declare a mistrial because of the reference to liability insurance, and that ruling was affirmed. Judge Urner, in speaking for this court, said:

"In the present cases a reference to the nature of the Markel organization was practically unavoidable, and the

resulting indication that the defendant had insurance protection would not have justified a termination of the trial on that ground, in view of the jury's presumptive knowledge of the legal requirement of public liability insurance for taxicab companies as common carriers. Code (Supp. 1935), art. 56, sec. 187R, art. 23, sec. 361."

We have, therefore, recognized that in situations where the reference to insurance of the defendant is practically unavoidable a mistrial will not be declared.

Exceptions to the strict rule have also been made in cases where the suggestion of insurance came from the defendant and in our opinion upon a reasonable basis, because a far different situation arises in that case then is present when an attorney for the plaintiff improperly questions witnesses relating to matters of insurance for the purpose of prejudicing jurors hearing the case. *Couch on Insurance, supra.* In *Association of Independent Taxi Operators v. Kern,* 178 Md. 252, 13 A. 2nd, 374, we said:

"If the insurance of the defendant is injected by the plaintiff, defendant usually moves for a mistrial, and is entitled to it; if by the defendant, whether by accident or design, there is no relief (*York Ice Machinery Corporation v. Sachs,* 167 Md. 113, 126, 173 A. 240; *International Co. v. Clark,* 147 Md. 34, 127 A. 647), but that does not entitle the plaintiff to make it an issue."

In the present case it could not be contended that appellee's counsel unfairly or improperly conducted himself during the trial in introducing the evidence objected to, because it is shown in the record that he first informed the court and opposing counsel that he wished to confer with them out of the presence of the jurors regarding a line of testimony which he felt he was required to offer. The jurors were then excused and the counsel stated to the court and opposing counsel the nature of the testimony to be given by his client and Attorney Woodward, but was informed by the court that no ruling could be given upon the matter until it came up in regular order. Afterwards the jurors were recalled and the parties were permitted to give the statement of appellee's executive

vice-president, Mr. Turnage, which was made to them on the morning following Abbott's discovery of his loss. Under the situation considered, we are unable to perceive any error on the part of the trial court in its admission.

It was admitted that appellant had rented appellee the safe deposit box in which to keep his valuables and securities, and if the jurors believed his testimony and the testimony of his witnesses, they must have found that he had the securities in the box and that the box itself with the securities contained therein disappeared without his knowledge, consent, or participation from the receptacle in which the bank had agreed to keep them protected. If appellee failed in that duty, it could be regarded in law as negligent, and negligence may be proved by direct or circumstantial evidence. It cannot be said that the statement made by the executive vice-president in answer to appellee's charges of the bank's neglect in failing to protect his property would not to some extent be relevant as indicating to reasonable minds an excuse on the bank's part for a relaxation of care, diligence and responsibility, because undoubtedly it was relevant to the very issue in the case. 1 *Jones on Evidence* (4th Ed.), secs. 137-138; 1 *Wigmore on Evidence* (4th Ed.), sec. 29. The fact that the bank's answer, and so far as is disclosed by the record its only answer, except that liability was denied, to his loss, injects insurance is a mere incident which does not justify the court, under any rule of evidence known to us, to exclude the statement referred to. It will be noted that the defendant itself, in mentioning insurance, first injected it into the case. On no grounds recognized by reason or justice should it now be heard to complain because its statement went before the jury when in the first instance appellant suggested it as an answer to the plaintiff's loss. Moreover, the statement of the executive vice-president is merely a part of all that took place between appelle and appellant after the loss had been discovered. Appellant, therefore, having injected insurance

apparently as its reason and only reason for the relaxation of due diligence in protecting the plaintiff's property is certainly not injured by this ruling. *Association of Independent Taxi Operators v. Kern, supra; Couch on Insurance, supra.*

The thirteenth exception was reserved when Gates, a witness for appellant, was asked by appellee's attorney on cross-examination, "Q. Didn't you tell him anything about you were covered by insurance? A. No." The appellant moved to withdraw a juror and declare a mistrial and on account of the court's refusal to do this the exception was taken. Gates denied having made such a statement and was not contradicted by any one, inasmuch as that statement, according to the other witnesses, had been made by Turnage. If, therefore, any error could be found in the ruling, it must be regarded as harmless.

*Judgement affirmed, with costs.*