## SNOWHITE, Etc. *v.* STATE, USE OF TENNANT, et al.

[No. 308, September Term, 1965.]

292

294

*Decided June 28, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*Joseph H. Young* and *Donald E. Sharpe,* with whom were *Dewey B. Morris* and *Piper & Marbury* on the brief, for appellant.

*Thomas J. S. Waxter, Jr.,* and *Melvin J. Sykes,* with whom was *Paul Berman* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

In this case the jury in the Superior Court of Baltimore City answered certain special issues on which a judgment for $90,000 was entered in favor of the plaintiffs below, Julia A. Tennant, surviving widow and Michelle Tennant, surviving child of Walter W. Tennant, deceased, and for $4,000 in favor of Mrs. Tennant as administratrix of the estate of her deceased husband, against Harold Snowhite, individually and trading as Service Oil Company (Snowhite), one of the defendants below and the appellant in this Court.

The decedent was killed while driving south on the Ritchie Highway at a point something over 200 feet north of the intersection of Shelly Road with that highway. The accident and his death resulted from the negligent operation of a gasoline tank truck owned by Snowhite and operated by Clarence Henderson (Henderson) while intoxicated. Henderson, who was driving north on the highway, had entered the southbound lane, instead of continuing in the northbound lane, and struck the automobile properly operated by the decedent (but owned by his employer, The Goodyear Tire and Rubber Company) substantially head-on at approximately 5:15 p.m. on November 29, 1961. The trial court (Grady, J.) directed a verdict in favor of the plaintiffs below against Henderson and the trial court's action in this regard is not challenged in this Court. The appellants, however, contend that the trial court erred in (1) permitting prejudicial references to insurance, (2) permitting the witness Mitchell Claude to testify in that his testimony was not in rebuttal and he was not listed as a witness in

the answers of the appellees to interrogatories, (3) in permitting the reading of portions of Henderson's deposition as substantive evidence against Snowhite on the issue of negligent entrustment, and (4) in failing to direct a verdict in favor of Snowhite because there was no legally sufficient evidence to support a finding by the jury that Snowhite had negligently entrusted the gasoline tank truck to Henderson.

In view of the action of the trial court in refusing Snowhite's motion for judgment notwithstanding the verdict and the contention of Snowhite that there was no legally sufficient evidence to support the finding of negligent entrustment, we must "resolve all conflicts in the evidence in favor of the" appellees, as plaintiffs below, "and assume the truth of all evidence and such inferences as may reasonably be deduced therefrom which tend to support the right of the * * * (plaintiffs) to recover." *Hogan v. Q. T. Corporation*, 230 Md. 69, 74, 185 A. 2d 491, 494 (1962) and prior Maryland cases cited in the opinion in that case.

In addition to the facts already stated, the record indicates the following: For a number of years prior to the accident, Snowhite and Alexius Dyer (Dyer) were suppliers of gasoline, diesel. oil and kerosene in the Baltimore area. Dyer had a contract to haul gasoline for the American Oil Company. When his trucks were occupied, he would arrange to have Snowhite's trucks handle the supplies. Dyer virtually retired in 1960. Before this, he had employed Henderson whom he had known for a number of years. After February 1960, Henderson began to work for Snowhite. Henderson's duties consisted primarily of driving either gasoline or kerosene trucks owned by Snowhite.

Henderson had known both Dyer and Snowhite for between 23 and 25 years and had worked off and on for them as a driver. Since 1952 he worked regularly, first for Dyer and later for Snowhite. His job for Snowhite was to drive Snowhite's trucks delivering gasoline, kerosene, fuel oil and bulk oil. Snowhite's kerosene truck was garaged at Kratz's Garage on Calverton Road. The gasoline trucks were stored at the yard of the American Oil Company in Curtis Bay. Although Snowhite had never expressly said that Henderson should "keep

the trucks", Henderson testified that if after making deliveries "I wanted to go somewhere * * * well all I had to do was just jump in the truck and go * * * I've been practically on my own insofar as the trucks is concerned." He stated that no complaint was made about using the trucks for his own purposes.

Henderson lived about two miles from Snowhite's Pearl Street office and approximately five miles from the American Oil Company yard at Curtis Bay. Snowhite knew that Henderson had no automobile of his own. He admitted that from time to time he had allowed Henderson to use any of Snowhite's available trucks and even Snowhite's own automobile to go to the American Oil Company's yard in Curtis Bay. These trucks were Henderson's usual mode of transportation to the American Oil Company yard. Henderson took one of Snowhite's trucks to Henderson's home numerous times for the night after Henderson had completed his deliveries. Snowhite knew of this practice and never objected to it.

Henderson used the trucks whenever he wished for his personal purposes, including going fishing after his deliveries were completed. It was common knowledge among Snowhite's drivers that Henderson was very much interested in fishing. Snowhite knew that Henderson had been using one of Snowhite's trucks to go fishing about twice a week from 9:00 a.m. when Henderson had completed his morning deliveries until 5 or 6 p.m., for a year prior to the accident. Henderson kept fishing equipment, including a rod and reel, in every truck. One of the fishing rods in the truck involved in the accident was owned by Snowhite who had loaned it to Henderson when Henderson used the truck to go fishing. Snowhite had expressly permitted Henderson to use a stake-body truck, owned by Snowhite for moving furniture and other personal property of Henderson's friends. Henderson expressly denied Snowhite's contention that on the day of the accident, Snowhite had told Henderson that after his morning deliveries "that would be all for the day" and that the gasoline truck should then be taken back to the American Oil yard.

On the day of the accident, Henderson reported for work at about 7:00 a.m. at Snowhite's office on Pearl Street in Balti-

more City. He received an order for a gasoline delivery to a customer at Pine and Saratoga Streets, and orders for some kerosene deliveries which were to be made from a different truck. He took Snowhite's gasoline truck, which he had parked on Pearl Street the previous evening (as he often did for convenience) to the American Oil Company yard in Curtis Bay to load it with gasoline. He finished loading the gasoline truck about 9:00 a.m. and completed his gasoline delivery at approximately 11:00 a.m. The gasoline customer was only about a half block from Snowhite's office on Pearl Street. Henderson then parked the gasoline truck on Pearl Street, three or four houses below the office, and put the delivery ticket through the door of the office. He did not feel like making the kerosene deliveries right then, so he went to a bar at Pearl and Saratoga Streets which had been his "stop-off * * * for the last couple of years anyway." He stated that it was there that Snowhite "could always find me in case anything came up during the day if I didn't have any orders."

After Henderson had drunk "about, almost a pint of whiskey" he picked up a girl who was in the truck with him when the accident occurred. He took the truck with the girl in it to a place near the American Oil yard for some "sporting". The accident occurred when he was coming back and was on the way to Kratz's Garage on Calverton Road in Baltimore City to pick up a kerosene truck to make his kerosene deliveries. Henderson said he had "intentions of doing more work" that day which was the reason for his driving back toward Kratz's Garage.

In 1959—about two years prior to the accident—Henderson began drinking heavily. He was convicted of reckless driving on February 17, 1959 and again on April 7, 1959, and still again on November 16, 1960. On October 25, 1961, he was convicted of failing to stop at a railroad crossing while driving a gasoline truck, thus making a total of four convictions for moving violations in approximately two and one-half years. Snowhite knew about these convictions, which were for violations while Henderson was driving Snowhite's trucks. Snowhite also knew about an accident in which Henderson was involved for which he was not convicted. Snowhite warned Hen-

derson that if he had any more accidents Snowhite would not be able to get any more liability insurance on the trucks.

During the two-year period prior to the accident during which Henderson was drinking heavily, he spent a substantial time every day at the Pearl Street bar. This bar was on the same street as Snowhite's office, approximately one-half a block away. Henderson drank whiskey at this bar for approximately 45 minutes to one hour between 7 and 8 a.m. (exclusive of other times), six days a week, immediately prior to driving Snowhite's trucks. Snowhite knew that Henderson frequented the bar daily during this two-year period and that Henderson drank. Indeed, Snowhite would send over to the bar or go over to the bar himself and get Henderson when he wanted Henderson to drive one of his trucks. Henderson would then come out of the bar, and thereafter, with Snowhite's knowledge that he had been drinking, he would get into one of Snowhite's trucks and drive it. Snowhite admitted that he would go over to the bar occasionally to get Henderson when he wanted Henderson to drive. On one of these occasions the witness Claude testified that approximately four or five months before the accident, Henderson and Claude had just finished their morning drinking, and Henderson was "talking loud" when Sonwhite came to the bar to get Henderson to drive.

Snowhite denied that he had knowledge of Henderson's incompetence as a driver or of his excessive use of alcohol. He also testified that he would not permit joy-riding. There were, however, in the record inconsistencies in Snowhite's testimony and discrepancies between his trial testimony and his deposition which would justify the jury in concluding that Snowhite was an unreliable witness and that his testimony in these regards was not to be believed.

The evidence in regard to the use of Henderson's deposition, the permitting of Claude to testify in rebuttal and the references to insurance will be considered when we consider these questions later in this opinion.

At the conclusion of the evidence, Judge Grady—quite properly we think—submitted eight issues to the jury and in his well considered charge explained the law in regard to each of the issues submitted. By its answers to the special issues, the

jury found that prior to November 29, 1961, Henderson was an habitually incompetent or unfit driver of a gasoline tank truck; the accident was caused by Henderson's habitual incompetence or unfitness as such a driver; Snowhite knew or should have known that Henderson was an habitually incompetent or unfit driver of a gasoline tank truck; and, that Snowhite entrusted Henderson with the gasoline tank truck involved in the accident. In regard to Dyer, the jury found that he knew or should have known that Henderson was an habitually incompetent or unfit driver of a gasoline tank truck, but that he did not permit Henderson to operate the gasoline tank truck involved in the accident. By its answers to issues 7, 7-A, 7-B and 8, the jury assessed the damages for the surviving widow and infant at $90,000, apportioned it $70,000 to the widow and $20,000 to the infant and awarded the widow as administratrix of the decedent's estate, $4,000. A judgment in favor of Dyer was duly entered and judgments against Snowhite and Henderson in the total amount of $94,000 were entered in accordance with the jury's answers to the issues submitted as above set forth, with interest from April 22, 1965 and costs of suit. Snowhite has appealed from that judgment.

The plaintiffs and appellees have filed a cross-appeal challenging the alleged error of the trial court in its instruction to the jury in regard to damages, but presses the cross-appeal in this Court only if the judgment in the lower court is reversed.

We have concluded that the trial court committed no reversible error and that the judgment must be affirmed. It will not be necessary, therefore, to consider the contentions asserted on the cross-appeal.

We will consider first the three alleged errors in regard to the evidence and then the principal contention of Snowhite that there was no legally sufficient evidence to support the finding by the jury that Snowhite had negligently entrusted the gasoline tank truck to Henderson.

(1)

Snowhite contended below and in this Court that the trial court had committed prejudicial error in permitting counsel for the plaintiffs to read portions of Henderson's deposition in

which he alluded to Snowhite's insurance and in allegedly admitting into evidence Snowhite's liability insurance policy.

Generally speaking, the law is well established that in an action to recover for personal injuries or wrongful death, evidence which informs the jury that the defendant is insured against liability is not admissible. *International Co. v. Clark*, 147 Md. 34, 127 Atl. 647 (1925). See Annot., *Admissibility of evidence, and propriety and effect of questions, comments, etc. tending to show that defendant in personal injury or death action carries liability insurance*, 4 A.L.R. 2d 761 (1949). This general doctrine, however, is not only subject to several well recognized exceptions but the modern trend is toward a relaxation of the rule. As our predecessors said in *Takoma Park Bank v. Abbott*, 179 Md. 249, 263, 19 A. 2d 169, 176 (1941) :

> "Moreover, in view of the presumptive knowledge on the part of present day jurors that public liability insurance is required to be carried by persons engaged in certain lines of endeavor, as well as the knowledge on the part of jurors that persons of business prudence and discretion often carry such insurance, the present day tendency is toward the relaxation of the strictness of the rule first announced."

In *Casey v. Roman Catholic Archbishop of Baltimore*, 217 Md. 595, 143 A. 2d 627 (1958) we quoted with approval from *McCormick on Evidence* (1954) §168, which pointed out that there was a group of exceptions to the general rule.[1] The Maryland cases indicate the following exceptions:

---

1. There are four exceptions listed in McCormick on Evidence, §168, page 356 as follows:

"First, the fact of insurance may be relevant upon some other issue such as agency or ownership or control of the vehicle or instrumentality involved.

"Second, the fact of insurance may be relevant as bearing upon the credibility of a witness.

"Third, the admission of a party bearing on negligence or damages may include a reference to the fact of insurance which cannot be severed without substantially lessening the evidential value of this admission.

"Fourth, the fact of insurance may be elicited unintentionally by examining counsel, when the witness makes an

1. Where the evidence is relevant to the cause of the accident or the liability of the defendant. *Takoma Park Bank v. Abbott, supra.*

2. Where the reference to insurance is made by the defendant or his witness, in which event the testimony is admissible and is subject to legitimate comment and argument. *Takoma Park Bank v. Abbott, supra.*

3. Where the evidence is relevant to an issue of which of two or more defendants was the employer of the operator of the vehicle involved. *Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 134 A. 2d 296 (1957).

There were three references to insurance during the trial of this case.

The first reference was in a portion of Henderson's pretrial deposition which was read to the jury. In replying to a question in regard to the knowledge of Dyer and Snowhite of Henderson's driving record, Henderson stated:

> "Mr. Snowhite said once if I had another accident, the insurance, they couldn't get *insurance* any more. * * *
>
> "We were in the office one morning * * * talking * * * about the last accident I had, that's what it was, if I had another accident, they couldn't, the truck wouldn't be *insured* or something like that." (Emphasis supplied).

In our opinion, this reference to insurance was relevant to one of the principal issues in the case, i.e., Snowhite's knowledge of Henderson's incompetence as a driver, and hence comes within the first exception, above mentioned, to the general rule. The appellant contends that since the statements of Henderson were in a pre-trial deposition and consequently known to be present in the testimony before it was presented to the jury

unexpected or irresponsive reference to insurance. The witness often is unaware of the conspiracy of silence about insurance and makes with utmost naturalness a reference to this all-pervading fact. The reference will be stricken on request but is usually not a ground for mistrial or reversal."

(rather than an inadvertent reference during examination of the witness at the trial), the reference to insurance should have been deleted prior to the reading of the testimony to avoid possible prejudice to the defendants, as was done in regard to a pre-trial statement in *Casey v. Roman Catholic Archbishop of Baltimore, supra*. But the Court in *Casey* pointed out that: "Where the deletion would produce a substantial alteration of the meaning of the phrase in which the reference to insurance was used, the exclusion should not be permitted." (Page 611 of 217 Md., page 634 of 143 A. 2d). In our opinion the elimination of any reference to insurance in the statements of Henderson quoted above would have indeed produced a substantial alteration in the meaning of those statements and such an exclusion should not have been permitted, even if requested.

The second reference to insurance was made by the defendant Dyer. In reply to a question put to him by his counsel on direct examination in regard to his arrangement with Snowhite for delivering petroleum products for Maryland Oil Company, Dyer stated, in part, the following:

"Mr. Snowhite hauled all the small deliveries and I paid him so much a gallon for doing it. It was his truck, his driver, his *insurance*. He maintained the truck he had; he took care of everything. I had nothing to do with it." (Emphasis supplied).

This statement was made by a defendant and falls within the second exception already mentioned. Snowhite contends that the rule should not apply to a co-defendant and Snowhite should be permitted to object to Dyer's statement in regard to insurance. But counsel for Snowhite did not object or move to strike out Dyers' reference to insurance, so that the point is not preserved on appeal. See Maryland Rule 885.

The third reference to insurance arose when counsel for the plaintiffs used a liability insurance policy upon the gasoline tank truck showing that it was issued in the name of Snowhite as an individual and Dyer, trading as Maryland Oil Company, in cross-examination of the defendant Dyer. This policy was exhibited to the witness Dyer but not to the jury and the policy was not offered in evidence as was suggested in Snowhite's

brief. Dyer admitted that he was aware of how the insurance was carried, that he had been in touch with his own agent to have the policy written and had furnished the American Oil Company with notice of the insurance.

The trial court had previously not permitted the use of the policy prior to Dyer's statement because it was not offered upon the issue of agency, but of control and to that time the trial court was of the opinion that the possible prejudice to Snowhite overbalanced the possible probative value it had on the issue of control of Henderson by Dyer. After Dyer, however, mentioned insurance as above set forth, the trial court permitted counsel for the plaintiffs to examine Dyer in regard to the liability policy to show that not only was Snowhite listed as one of the named insured but that Dyer was *also* named as one of the insureds. This was proper cross-examination. It was relevant to the issue of whether or not Dyer did have sufficient control over Henderson to have permitted him to use the gasoline tank truck on the day of the accident. At that point there could be no prejudice to Snowhite in the use of the policy in cross-examination as the evidence that Dyer was *also* a named insured *along with* Snowhite would tend to be favorable to Snowhite rather than otherwise.

This cross-examination by plaintiffs' counsel which, in effect, corrected the implication of Dyer's testimony that Snowhite was the sole insurer, did not "make insurance an issue" as was done in *Taxi Operators v. Kern*, 178 Md. 252, 13 A. 2d 374 (1940) where after a witness for the defendant testified in regard to liability insurance coverage by the various automobiles, counsel for the plaintiff even called the agent of the insurer and further developed the matter of insurance.[2]

Snowhite complains that the trial court did not specifically instruct the jury in its charge that the inclusion of the named insureds in the liability policy would have no effect upon Snowhite. In our opinion, the trial court's charge which limited the

---

2. Even in this somewhat aggravated case, our predecessors held that this was harmless error as the undisputed evidence showed that the defendant was not insured and that the result in the case indicated that it was "not produced by inflammation, excitement or prejudice." (Page 260 of 178 Md., page 377 of 13 A. 2d).

jury's consideration in reference to issue 5 (entrustment by Snowhite of the gasoline truck to Henderson) to the evidence in regard to the relationship that existed between Henderson and Snowhite, without specific mention of the policy, but specifically mentioned the policy and the two named insureds in connection with issue No. 6 (permission of Dyer to Henderson to use the gasoline truck on the date of the accident), properly presented the matter to the jury. The jury's answer "No" to issue No. 6 and the amount of the damages assessed by the jury indicate to us that the reference to the policy did not prejudice Snowhite.

We have concluded that there was no prejudicial error in this case resulting from the references to insurance.

## (2)

Snowhite contends that the trial court abused its discretion in permitting the witness, Mitchell Claude, to testify because his testimony was not rebuttal testimony and he was not listed as a witness in the plaintiffs' answers to interrogatories.

The witness Mitchell Claude was located just before the end of the trial. His name, of course, did not appear on the list of names of witnesses given by the plaintiffs' answers to interrogatories, but it should be pointed out that in that answer to interrogatories, the plaintiffs advised the defendants that the investigation was continuing and that the defendants would be advised of the identity of any person whom subsequent investigation would disclose. Counsel for the plaintiffs did notify counsel for the defendants on the morning of April 21, 1965 that the witness Claude had been located and what his testimony would likely be. The defendants objected to Claude being allowed to testify for the reasons already stated. The trial court overruled the objection and Claude thereafter testified. He testified that he had known Henderson for 12 or 15 years as a friend and they drank together on occasions at the bar at Pearl and Saratoga Streets. They would be together for between 30 to 45 minutes. After leaving that bar Claude had seen Henderson headed back to the Maryland Oil Company office where he was going. He had seen Henderson in a Maryland Oil Company truck after Henderson had been drinking. He had seen

Snowhite and Henderson together at the Maryland Oil Company on Pearl Street and one time just after Claude and Henderson had had a drink, he saw Snowhite come in the bar door and Henderson and Snowhite went down the street together. This occurred four or five months prior to the accident. He remembered that on that occasion when he saw Snowhite come to the bar, Henderson was "talking loud" and Claude and Henderson had "just finished" drinking.

As Snowhite conceded in his brief and at the argument, normally it is within the discretion of the trial court to allow testimony on rebuttal which, in fact, does not rebut. *Snowden v. State,* 133 Md. 624, 106 Atl. 5 (1919). In *Snowden* our predecessors cited 2 Poe, *Pleading and Practice,* Sec. 287 with approval and quoted from Sec. 287 as follows:

> "[I]t is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief. The subject is one which is addressed to the sound discretion of the court; and the appellate court will not reverse for an error on this point, unless the ruling of the court below was both manifestly wrong and substantially injurious. Indeed, as a general rule, in such cases no appeal will lie." (Page 636 of 133 Md., page 10 of 106 Atl.).

This discretion may be abused by the trial court, but in this case we find no abuse of discretion in the trial court's permitting all of Claude's testimony to be taken under the circumstances already given. His testimony was important. He had just been located. Counsel for the defendants were advised of the substance of his testimony shortly before he testified and part of his testimony was rebuttal testimony.

### (3)

Snowhite earnestly contends that the admission of a portion of Henderson's deposition as substantive evidence against Snowhite on the issue of negligent entrustment was both erroneous and prejudicial. On the question of admissibility, Snowhite's argument has three prongs: (a) that the trial court misconstrued Maryland Rule 413 which, when read in its entirety,

does not permit the use of a party's deposition when that party is present and available as a witness at the trial; (b) that although Henderson and Snowhite were joined as co-defendants they did not share identity of interests and the deposition of Henderson could not be used against Snowhite on a separate and distinct issue in the absence of such identity of interest; and, (c) on the issue of negligent entrustment Henderson was not an adverse party to the plaintiffs and his deposition is controlled for use at the trial by Section (a) (3) of Maryland Rule 413. Snowhite also contends (d) that he was prejudiced by the alleged errors of the trial court. We disagree with all of the contentions.

(a)

The pertinent parts of Maryland Rule 413 read as follows:

"a. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissibile under the rules of evidence, may be used in accordance with any one of the following provisions:

1. Contradiction and Impeachment.

Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.

2. By Adverse Party.

*The deposition of a party* or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association which is a party may be used *by an adverse party for any purpose.*

3. Witness Not Available-Exceptional Circumstances.

The deposition of a witness, whether or not a party, may be used by any party for any purpose against any other party *who was present or represented at the taking of the deposition or who had due notice thereof,* if the court finds:

(1) that the witness is dead, or

(2) that the witness is out of the State, unless it appears that the absence of the witness was procured by the party offering the deposition; or

(3) that the witness is unable to attend or testify because of age, mental incapacity, sickness, infirmity, or imprisonment; or

(4) that the party offering the deposition has been unable to procure the attendance of the witness by summons; or

(5) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." (Emphasis supplied).

Maryland Rule 413 (a) is almost identical with Rule 26 (d) of the Federal Rules of Civil Procedure, which provides as follows:

"(d) At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence may be used against any party *who was present or represented at the taking of the deposition or who had due notice thereof,* in accordance with the following provisions * * *." (Emphasis supplied).

Then follow in almost identical language the three paragraphs already quoted from Maryland Rule 413 (a). It is seen that Maryland Rule 413 was modeled on Federal Rule 26 (d) *except* that the italicized portion of Federal Rule 26 (d) was eliminated from Maryland Rule 413 (a) and was inserted in subparagraph (3) of Maryland Rule 413 (a) as applicable to depositions of witnesses who were not available. It is thus seen that the provision in the Maryland rule in regard to the use of a deposition of an adverse party for any purpose is to the extent mentioned *broader* than the federal rule. This transfer of language in the Maryland rule was obviously by design and makes the Maryland rule even more far reaching in the use of depositions of adverse parties than the federal rule.

Our predecessors have indicated that inasmuch as the Maryland discovery rules are so closely patterned after the federal discovery rules, this Court will look to federal decisions con-

struing the corresponding federal rule for guidance in constru-
ing the similar Maryland rule. *Hallman v. Gross,* 190 Md. 563,
59 A. 2d 304 (1948); *Eastern States Corp. v. Eisler,* 181 Md.
526, 30 A. 2d 867 (1943). As the Maryland rule is even broader
in application than the federal rule as we have indicated, it fol-
lows that federal cases permitting the use of the deposition of
an adverse party under circumstances similar to those in the
case at bar, are quite persuasive. The federal cases have indi-
cated that the federal rule is to be interpreted literally and
means just what it says, i.e., that the deposition of an adverse
party may be used *"for any purpose."* The deposition, or rel-
evant parts thereof, of an adverse party may, therefore, be
used as substantive evidence against other adverse parties even
though that adverse party is present and available for giving
testimony. Its use is not limited to impeachment of the testi-
mony of the adverse party, although it may be used for that
purpose too, if the adverse party testified. As stated by the
United States Court of Appeals for the Ninth Circuit in *Pur-
sche v. Atlas Scraper & Engineering Co.,* 300 F. 2d 467, 488
(9th Cir. 1962):

> "Atlas had taken Pursche's testimony pursuant to Fed.
> Rules Civ. Proc., Rule 26, 28 U.S.C.A. in connec-
> tion with its discovery and at the trial offered the
> depositions en masse as original evidence. But the
> court refused their admission. It does not appear that
> the depositions were irregularly taken or that the court
> rejected them because they were lengthy and no doubt
> contained much that was repetitious, extraneous or
> otherwise inadmissible. Rather, it appears the court
> was of the opinion that since Pursche was present At-
> las was required to call him as a witness and could
> not use his deposition to prove any fact or facts there-
> in stated. This conclusion is manifest for in ruling,
> the court flatly said: 'You are not entitled to have the
> depositions introduced if the witness is here except for
> impeaching purposes.' This was error. The use of
> depositions is regulated by Rule 26 (d); subsection
> one permits 'any party' to use a deposition to impeach
> the deponent as a witness, while subsection three per-

mits 'any party' to use the deposition of any person as primary proof of the facts stated there provided the deponent is first shown to be unavailable as a witness; but subsection two permits 'an adverse party' to use the deposition of 'a party * * * for any purpose' and imposes no preliminary conditions to this use of the testimony. This is but a tacit way of saying that the deposition can be used as original evidence regardless of the presence or absence of the deponent. Pfotzer v. Aqua Systems, Inc., 162 F. 2d 779 (2d Cir. 1947); Merchants Motor Freight, Inc. v. Downing, 227 F. 2d 247 (8th Cir. 1955); 4 Moore Fed. Prac. p. 1190."

See also *Riley v. Layton*, 329 F. 2d 53, 58 (10th Cir. 1964).

In our opinion, the trial court correctly interpreted Maryland Rule 413 (a) to permit the use of Henderson's deposition as substantive evidence even though Henderson was in court and available as a witness.

### (b) and (c)

Although it is true that parties are not necessarily "adverse" because they appear to be so by their alignment in the pleadings, it seems clear that the interest of the plaintiffs and Henderson was adverse and the plaintiffs were "adverse parties" to Henderson within the meaning of the Maryland Rule 413. As such they had the right to introduce "any part or all" of Henderson's deposition "for any purpose." There is no limitation upon the use of the adverse party's deposition other than that contained in Maryland Rule 413 (a) itself, i.e., that it may be used only "so far as admissible under the rules of evidence." If Henderson had testified in person, the substance of his testimony in the deposition would have been admissible, and hence was admissible by use of his deposition under Maryland Rule 413 (a). The weight of the testimony as it might apply to a co-defendant with whom there was no identity of interest on one of the issues in the case would be for the jury.

The trial court gave the right to Snowhite to cross-examine Henderson in open court on the substance of his deposition testimony, so that Snowhite did not need to suffer from the

absence of Henderson's "live testimony" if he did not wish to do this. As a matter of trial tactics Snowhite did not avail himself of the opportunity given by the trial court to cross-examine Henderson and Snowhite cannot now complain that Henderson's reliability "was never challenged by a confrontation before the jury or before the court," as Snowhite states in his brief in this Court. Cf. *Pursche v. Atlas Scraper and Engineering Co., supra; State v. Wolkoff,* 250 Minn. 504, 85 N. W. 2d 401 (1957) and *Lambe v. Reardon,* 69 N. J. Super. 57, 173 A. 2d 520 (1961) which cases indicate that there is no prejudice resulting from an error in excluding the deposition of an adverse party even though that party is available to testify, if the party seeking to offer the deposition examines the deponent at the trial and obtains the relevant information from the deponent in open court.

The plaintiffs make the contention that Snowhite did not properly preserve this question in the trial court by not raising these specific grounds of objection to the admissibility of portions of the Henderson deposition. As we have passed upon the point on its merits, we do not find it necessary to consider whether or not the point was properly preserved below.

## (4)

Having considered the question raised in regard to the admissibility of testimony, we now turn to the principal contention of Snowhite, i.e., that the trial court erred in failing to direct a verdict in his favor because there was no legally sufficient evidence to support a finding by the jury that he had negligently entrusted the gasoline tank truck to Henderson.

The doctrine of "negligent entrustment" is well stated in 2 Restatement, Second, Torts, Section 390, as follows:

> "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

Our predecessors held that this doctrine was applicable in Maryland in *Rounds v. Phillips*, 166 Md. 151, 170 Atl. 532 (1934)—the "first *Rounds* case"—and cited the prior section (Section 260) of the Restatement of Torts on which Section 390 is based and continued in substantially the same language. The Court in the first *Rounds* case pointed out that the Court as early as 1921 in *Whitelock v. Dennis*, 139 Md. 557, 563, 116 Atl. 68, 70 (1921) had by *dictum* indicated that this doctrine would be applicable in Maryland, but that there had been no holding to that effect in the cases prior to the first *Rounds* case. Judge Offutt for the Court, elaborately reviewed the authorities upon which the doctrine rested and stated that although generally speaking an automobile was not in itself an inherently dangerous instrumentality, if the owner "loans his automobile to another who is known to the owner to be habitually reckless and to operate an automobile under the influence of liquor, under such conditions the automobile, plus the incompetency of the person to whom it is entrusted, does create an inherently dangerous instrumentality." (Page 163 of 166 Md., page 536 of 170 Atl.).

In *Rounds v. Phillips*, 168 Md. 120, 177 Atl. 174 (1935) —the "second *Rounds* case"—this Court had before it a judgment for the defendants, the mother and father of the operator of the injuring automobile, upon a verdict directed by the trial court. The principal question on appeal, as in the case at bar, was whether the evidence was legally sufficient to go to the jury on the issue of negligent entrustment. In reversing the judgment, our predecessors indicated that the knowledge of the parents that their son had had his driver's license revoked after a conviction for driving an automobile while intoxicated, the transfer of the title of a Buick car to his mother and the title of a Ford car to his father and the obtaining by the son of the reissuance of his driver's license after which the son thereafter resumed the use of the Buick automobile and his habit of reckless driving were sufficient facts to prompt an investigation by the parents as to the habits of their son as the driver of an automobile by which investigation they would have learned "the additional and regrettable facts * * * as to their son's recklessness in the operation of a car on the public highways."

Chief Judge Thomsen of the United States District Court for the District of Maryland in *State, use of Weaver v. O'Brien,* 140 F. Supp. 306 (1956), a diversity of citizenship case in which the federal court applied the Maryland law, considered the second *Rounds* case, reviewed other state authorities and indicated that since the decision in that case there has been a substantial increase in both scientific and popular knowledge of the unfortunate effect of even moderate amounts of alcohol upon a driver's reaction time and other elements of driving. He stated at pages 310 and 311 of 140 F. Supp.:

"*Rounds v. Phillips* is the only case in which Maryland has had to pass on the question of how much knowledge of a driver's recklessness is essential to take a case to the jury. In other States, however, *defendants have been held liable for entrusting their motor vehicles to drivers known to become intoxicated. Crowell v. Duncan,* 145 Va. 489, 134 S. E. 576, 50 A.L.R. 1425; *Chaney v. Duncan,* 194 Ark. 1076, 110 S. W. 2d 21. Other courts have been less strict in holding the owner liable. For example, *Fisher v. Fletcher,* 191 Ind. 529, 133 N. E. 834, 22 A.L.R. 1392; *Sanders v. Lakes,* 270 Ky. 98, 109 S. W. 2d 36. In *Williamson v. Eclipse Motor Lines,* 145 Ohio St. 467, 62 N. E. 2d 339, 342, 168 A.L.R. 1356, where a verdict for the plaintiff was reversed because the defendant did not have knowledge of the driver's reckless tendency or drinking propensity or the fact that his Ohio driver's license had been revoked, the court recognized the following rule:

'*In the cases involving the entrustment of a motor vehicle to an intoxicated driver, or one whose drinking propensities are known by the owner,* it is *generally held that the owner assumes the risk of recklessness of such driver, even though the driver was sober when the motor vehicle was placed in his possession, for the reason that the owner is put on notice of what is likely to occur if one addicted to drinking drives a motor vehicle.*'

"No quantitative line can be drawn with respect to

the amount of knowledge which an owner must have of a driver's propensity for drinking to make the owner negligent in entrusting a motor vehicle to him. All of the circumstances of the case must be considered, including the type of vehicle and the area in which the vehicle is to be operated. In this case, the vehicle was a *heavy dump truck,* to be driven loaded with sand and gravel. The truck *was to be driven in and around the City of Washington, a large metropolitan center, where traffic is exceedingly heavy. Chaney knew that O'Brien drank.* He was so worried about O'Brien driving the truck at night and on week-ends after he had been drinking that he revoked permission previously given to O'Brien to keep the truck overnight and over the week-ends. There was evidence from which the jury might find that within three weeks before the accident Chaney had found O'Brien drunk in the truck parked outside a tavern in the afternoon of a working day. This evidence is admittedly not as strong as the evidence in *Rounds v. Phillips;* but the Court of Appeals in that case approved the broad rule set out in the Restatement, and *since 1933 there has been a great increase in both scientific and popular knowledge of the effect of even moderate amounts of alcohol on a driver's reaction time and other elements of driving.* The holiday slogan 'Let the one for the road be coffee' has won approval even from distillers. The common law is not static but adapts itself to changing conditions and increasing knowledge. *Barnes Coal Corp. v. Retail Coal Merchants Association,* 4 Cir. 128 F. 2d 645, 648; *Damasiewicz v. Gorsuch,* 197 Md. 417, 440-441, 79 A. 2d 550." (Emphasis supplied).

Snowhite concedes, both in his brief and at the argument, that there is sufficient evidence to show that Henderson was an habitually incompetent operator of a motor vehicle; that Snowhite had the right to permit as well as the power to prohibit the use of the gasoline tank truck involved in the accident; and, that the accident itself resulted from Henderson's

negligence in the manner he drove the gasoline truck while he was intoxicated. The issues in regard to negligent entrustment are thus narrowed to two issues of fact in regard to which Snowhite contends that there was no sufficient evidence to support a finding (1) that Snowhite entrusted the gasoline tank truck to Henderson at all, and (2) that Snowhite had either actual or constructive notice that Henderson was unfit as a driver.

In our opinion there was sufficient evidence, with the reasonable inferences to be drawn from that evidence, to support the verdict of the jury. Snowhite knew of Henderson's convictions; he knew of the extent to which Henderson frequented the Pearl Street bar; he had close association with Henderson during periods immediately after Henderson had been drinking heavily and he had directed Henderson to drive Snowhite's trucks after such drinking. Snowhite admitted that he knew of the danger involved in permitting a person to drive if alcohol was detectable on his breath. The vehicle involved was a large gasoline tank truck which requires more skill to drive than does a passenger automobile. The truck was to be driven in a large metropolitan area where traffic is heavy. Henderson was justified in regarding himself free to use the gasoline tank truck for his own purposes with the knowledge and acquiescence of Snowhite in view of the entire background and the custom of entrusting the trucks to Henderson for his own uses. See *Crowell v. Duncan*, 145 Va. 489, 134 S. E. 576 (1926), *Levy v. McMullen*, 169 Miss. 659, 152 So. 899 (1934). See also *V. L. Nicholson Construction Co. v. Lane*, 177 Tenn. 440, 150 S. W. 2d 1069 (1941).

> *Judgment affirmed, the costs to be*
> *paid by the appellant.*